### THE UMATTILLA.[1]

### O'BRIEN and others *v.* THE UMATTILLA.

*(District Court, N. D. California. December 1, 1886.)*

SALVAGE—SEAMEN AS SALVORS—SUPEREROGATORY SERVICES.
   When the master and the major portion of the crew have quitted the ship, renouncing all hopes of saving her, and a few of the crew have remained, in spite of the expostulations, and almost against the commands, of the master, to confront dangers which he and their companions have declined to encounter, and by so doing have saved the ship, justice, as well as the true interests of owners and insurers, demands that the courts should recognize, as a legal right, their claim to compensation as salvors for supererogatory services.

In Admiralty.
*Page & Eells, (Arthur Rodgers, of counsel,)* for libelants.
*Milton Andros,* for claimants.

HOFFMAN, J.   On the morning of February 9, 1884, the steam-ship Umattilla, Frank Worth, master, bound on a voyage from San Francisco to Seattle, struck on a rock of Flattery reef, some 12 or 13 miles to the southward of Cape Flattery. The captain, warned of danger by short blasts of the steam-whistle, had barely time to reach the deck, when he was felled by the shock caused by the striking of the ship upon the rock. He at once gave orders to the engineer to go ahead slowly, in order to prevent the vessel from sliding off the rocks, and foundering in deep water. The first officer was ordered to sound the forward hold. In his deposition the captain is made to say that the first officer reported 18 feet of water in this lower hold. This is evidently an error, perhaps clerical. There is no doubt, however, that on taking off the fore-hatch the hold was found full of water, and it was by all hands expected that the ship would speedily founder.

[1]Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

While the first mate was forward, engaged in getting the stay-sail adrift, and lifting the hatches to ascertain the condition of the hold, the captain had ordered the boats to be made ready, and, when the mate came aft, the port boat had been lowered, and occupied by a crowd, chiefly of coal-passers and firemen, to the number of 17 or 18 persons. A similar rush was made for the starboard boat, but it was checked by the firmness and decision of the mate, who succeeded in restoring some sort of order and discipline. The starboard boat having been lowered, it was immediately filled by the members of the ship's company, including the master, who took with him his dog and his gun. Mr. O'Brien, the mate, remained on deck alone, or, perhaps, with one man, who subsequently got into the captain's boat. The life-raft had in the mean time been launched by Mr. O'Brien, assisted by two of the men. It consisted of two metallic, spindle-shaped, air-tight tanks, connected by a grating, and was ten or fifteen feet long by five or six feet wide. It was provided with rowlocks and oars, but they afforded very insufficient means of propelling her through the water. It was evidently designed to be used, as its name implies, namely, as a raft or float. The engine was still working slowly, to prevent the vessel from slipping off the rock, and going down head foremost, as was by all hands momentarily expected. The pumps were also at work, pumping out the forward ballast tank.

The master did not deem it safe or prudent to wait to see what might be the effect of this operation. He appears to have been anxious to get away from the ship as quickly as possible, and urged Mr. O'Brien, according to the testimony of the latter, to "come along quick, and get away in the boats." "The ship will be going down, and be taking us all down in the boats." The mate had, however, determined to take to the raft, with the view of staying by the ship, and "seeing the last of her." He gathered up, he says, a few of his little effects, and, having put them in a bag, came out on deck. At that time he was the only person remaining on board. All hands, the captain included, were "singing out to him to come off, she will be down, and taking us down." The mate jumped upon the raft, which was attached by a line to the stern of the captain's boat, and called for volunteers to come out of the boat, and remain with him on the raft. Two men, the co-libelants, answered to his call. As the captain was about to put off, he repeatedly urged Mr. O'Brien to come off the raft into the boat; telling him that the ship would go down very soon, that a gale was probably coming on, and that he didn't wish to see him drowned. Mr. O'Brien replied, in effect that he was not scared; that his life was insured for $3,000, and which his wife would get; and that this was the only chance he had ever had of getting even with the insurance company. He reminded him, too, in rough but expressive seaman's language, of the discredit that would attach to them if any one else should board the ship, and "we be disconnected with her, or ashore." He offered to get into the boat if the captain would come upon the raft and remain by the ship; telling him that he would assuredly come back for him with a boat's crew. To this the captain made no reply. In his deposition the master states that he

went upon the raft, and from it got into the boat, at the mate's urgent solicitation, and upon Mr. O'Brien's declaring that he was unwilling, or felt himself incompetent, to take charge of the boat. In this statement he is not corroborated by a single witness.

Mr. Neiman, chief engineer, a witness called by the claimants, testifies that he saw the captain in the second mate's boat with eight or ten men; that he came out of it on deck, and had a short conversation with Mr. O'Brien, and then went into his own boat. This circumstance, though not mentioned by Mr. O'Brien, is also testified to by several of the crew. At the time Mr. Neiman saw the captain in the second mate's boat with eight or ten men, all the rest of the crew were still on the ship. The second mate's was the first boat lowered into the water, as it was the first to put off for the shore. The master thus appears to have been among the very earliest to despair of the safety of the ship, and to provide for his own, by taking refuge in the boat. I feel justified in saying that I do not believe that the master was upon the raft, or ever had any idea of going upon it; and I am satisfied that the foregoing account of the circumstances attending the abandonment of the vessel by all the ship's company excepting Mr. O'Brien and his companions is substantially true.

Before proceeding to state the circumstances under which Mr. O'Brien and the co-libelants succeeded in saving the ship, it will be well to narrate, briefly, what befell the boats, and what was done by the master's orders after leaving the ship. When the master bade good-bye to Mr. O'Brien, he promised that, after reaching the shore, he would send a boat for him. That this promise was made with any intent or expectation of resuming possession or command of the ship I do not, for a moment, believe. I do not, of course, think that the master intended, after providing for his own safety, to abandon, without any effort, Mr. O'Brien and his companions to their fate. He knew that if the ship went down, as he confidently expected, it would be almost impossible for them to reach the shore, supposed to be one and one-half or two miles distant, on the raft. Common humanity required that he should make some effort to save his first officer, and the men who had devoted themselves to what they thought imminent risk of death, under what he must have considered the fantastic and absurd notion that duty required them to remain by the ship, and "see the last of her," at whatever hazard. The captain's boat put off from the ship about 20 minutes after the second mate's boat.

On its way to the shore, the second mate's boat, with a crew, was met. She had landed the men on an island for temporary safety, and was returning to the ship. The island upon which they had been landed was destitute of water or shelter. The captain, therefore, ordered the boat, which was accompanied by some Indians in canoes, to return to the island, take off the men, and make for the main-land. This was effected, the boats being piloted by the Indians, who took on board of their canoes some of the men. The land was reached in about an hour and a half from the time the captain's boat left the ship. The weather was

very cold, snow was falling, and the men were more or less exhausted by their exposure and labor in the boats. A fire was kindled, hot coffee prepared, and, at the expiration of half an hour or an hour, the master directed the second mate to go with a boat's crew to Mr. O'Brien's relief. The men state that the captain gave no orders on this subject, and that the boat put off at their suggestion. Mr. Neiman, however, says that the captain gave the order; but he also states that he suggested that he and the captain ought to go in it. This suggestion was not acted on by the master, for the reason, as he says, that he was frost-bitten, or had chilblains. At this time the ship was not visible from the shore, and the boat soon became lost to sight. She had not proceeded far, when the steamer was descried with sails set, and under way. An attempt was made to overhaul her, but was soon abandoned as hopeless, and the boat returned to the shore. The men were subsequently taken in a steam-tug, which the captain had sent an Indian runner to procure, to Seattle, where they were discharged.

I return to Mr. O'Brien and his companions on the raft. At the time the captain's boat started for the shore the raft was lying at right angles to the bow of the steamer, and distant from her some 100 or 150 yards. Observing that the wind was increasing, Mr. O'Brien directed the men to paddle up to the ship, get on board, and endeavor to procure some food, as they had none on the raft. One of the men, by O'Brien's orders, got on board the ship, took what supplies he could find in the pantry, and returned with them, together with a small compass, to the raft. This was done as quickly as possible, as the vessel was momentarily expected to founder or to break up. The man, before leaving the vessel, threw over a line from about amid-ships, which, though not at the time made use of, proved subsequently of great service. After receiving the supply of food, which consisted of two cans of condensed milk, a few apples, and a couple of rolls of butter, the raft was paddled around to the stern of the vessel, and made fast to her log-line.

In the mate's bag was a pair of blankets. One of these was cut up, and made into mufflers. The men were directed to take off their boots, and wrap the strips of blanket around their feet, to prevent their freezing. The other blanket was used as a shelter from the snow, which was falling fast. The weather the mate describes as "bitterly cold." This condition of affairs remained unchanged for perhaps two hours, when the mate noticed that the vessel was drifting. His first thought seems to have been that she would immediately founder; but, after watching her for 20 minutes to one-half an hour, and observing that she was not sinking, Mr. O'Brien proposed to his companions to endeavor to get on board of her. The raft was accordingly pulled up under the vessel's counter, and two unsuccessful attempts were made to run a rope to the rudder chains of the steamer. After resting a little while, an effort was made to board her amid-ships; the men, in the mean time, having been somewhat invigorated by the contents of a small flask of whisky, a part of which they used as a stimulant, and part to rub on their hands. Their first effort was to catch the line that had been thrown over from amid-ships

of the vessel. In this they succeeded, and, after hauling up amid-ships of the vessel, Mr. O'Brien endeavored to get on board of her. In this attempt he failed.

The raft was then dropped astern, when Mr. O'Brien observed that the vessel was drifting broadside, towards some rocks which lay on her starboard bow. Seeing that no time was to be lost, he determined to make one more attempt to get on board. The attempt was attended with much difficulty, and not without risk. The line, where it was out of water, was covered with icicles. The side of the vessel was 12 or 14 feet high, and slippery with "frozen snow." He at last managed to climb up her side. He immediately threw a line to the men on the raft, and, having cut the ship's side steps or ladder adrift, he pulled them over the deck, which was covered with snow to the depth of two or three inches, and put them over the side. The raft was then hauled abreast of the steps, and the men, taking each a line in his hand, jumped, at the mate's order, for the steps, which they succeeded in catching, and clambered on board in safety. Their first care was to get head-sails on the ship, to make her pay off and clear the rocks, which were looming up, and "seemed," Mr. O'Brien says, "to be very close."

While the men were engaged in getting head-sails on the ship, the mate went to the pilot-house, and, having disconnected the steam steering gear, put the helm hard a-port. The vessel immediately began to pay off, and the mate saw, through the rigging, that she was swinging clear of the rock. The raft had, in the mean time, broken adrift, carrying with it all the mate's effects, clothes, books, watch, and chain, etc. Still apprehensive that the vessel might founder, the men set to work to construct a raft or float. The only available material was a small pair of gang planks, two fore and aft fenders, some eight or ten feet long by eight inches wide, and a couple of inch boards. These they lashed together to make a float, which they hoped, if the vessel went down, would afford them some chance of saving their lives. Finding that the ship still kept afloat, and seeing no boats approaching from the shore, Mr. O'Brien "made up his mind that he would try and save the ship."

The sails were trimmed as well as the circumstances permitted, and the vessel's course was laid for the Columbia river, supposed to be distant about 100 miles. About two hours later a schooner was discovered bearing down to them, attracted no doubt by their signal of distress. After some negotiations, the master of the schooner agreed to send three men on board, to be paid at the rate of $50 per day. With the aid of these men, other sails were set or trimmed, and the vessel resumed her course.

About 5 o'clock P. M. the steam-ship Wellington was descried. A hawser was got up from the hold, taken on board of the Wellington, and the vessel was towed into Esquimalt harbor. She had remained during the passage in the charge of the mate. His crew was composed of two men, who had been with him on the raft, the three whom he had obtained from the schooner, and two volunteers from the Wellington. The vessel reached Esquimalt harbor safely, but from some accident or mis-

management, into the details of which it is unnecessary to enter, but for which the mate is in no way responsible, she was suffered to sink. The mate was aroused in the middle of the night, and he and the crew barely escaped with their lives. He was the last man to leave the ship. When he left her he was up to his waist in water. The vessel was subsequently raised, and restored to her owners.

From the foregoing narrative it will be at once recognized that there entered into the services performed by Mr. O'Brien and his comrades nearly every element which can impart to a salvage service the highest degree of merit. To their interposition the safety of the vessel may almost certainly be ascribed. But for them she would, in all probabilities, have been lost on the rocks towards which she was drifting, and, even had she escaped that peril, she would have drifted out to sea, and been a total loss, or, at best, would have been picked up by other salvors, who would have been entitled to the reward allowed to salvors of a derelict.

No attempt was made at the hearing to disparage the skill, courage, and devotion of the libelants. Their claim is resisted on the ground that, being seamen attached to the ship, their claim as salvors cannot be allowed. That seamen cannot, in general, be admitted to claim as salvors is well settled. The rule is placed by Lord Stowell on the ground that by the seaman's contract it is his "stipulated duty to protect the ship through all peril, and to devote his entire possible service to that end." For this service his only reward is his wages. He admits, however, that, in "the infinite range of possible events, circumstances might present themselves that might induce the court to open itself to the seaman's claim for salvage." *The Neptune*, 1 Hagg. Adm. 235. The English admiralty courts, although adhering to the doctrine enunciated by Lord Stowell, admit that the seaman may be considered a salvor if his contract be dissolved; and that this may be effected by the final abandonment of the ship, or by the act of the master giving the seaman a discharge. *The Warrior*, Lush. 476.

In America the harshness of the rule laid down by Lord Stowell has been still further mitigated.

In *The Two Catherines*, 2 Mason, 338, Judge Story observed:

"In my humble judgment, there is not any principle of law which authorizes the position that the character of seamen creates an incapacity to assume the character of salvors; and I cannot but view the establishment of such a doctrine as mischievous to the interests of commerce, inconsistent with natural equity, and hostile to the growth of sound morals and probity."

In *Hobart* v. *Drogan*, 10 Pet. 121, the supreme court, after announcing the general rule that seamen are not, in general, allowed to become salvors, adds:

"We say, in the ordinary course of things; for extraordinary events may occur in which their connection with the ship may be dissolved *de facto*, or by operation of law, or *they may exceed their proper duty*, in which cases they may be permitted to claim as salvors."

"When mariners," observes Mr. Curtis, "may be said to have exceeded their proper duty, the *legal relation, being still undissolved*, is certainly not capable of definition apart from circumstances. There is much intrinsic difficulty in the question." Curt. Mer. Seam. 290.

The observation is just; but I am persuaded that, if the ruling of the supreme court can apply to any circumstances whatever, it must to the case at bar. The question here presented is not that suggested by Mr. Curtis, viz., if extraordinary services, performed by seamen whose contract remained undissolved; for it is claimed that the contract was dissolved by the final abandonment of the ship by the master, and by his urgent and repeated solicitation to the mate to follow his example.

It is not questioned that, to constitute an abandonment by the master, he must have quitted the ship without hope of saving her, and without the intention of returning to and resuming possession of her. That the master was among the first to despair of her safety, and to provide for his own, cannot be disputed. No one, not even the salvors, appear to have entertained a hope that the ship could be saved. No such expectation, at least in any definite or conscious way, seems to have been the motive of the mate's conduct. He appears to have acted upon a kind of instinctive feeling as to to what it became a loyal seaman to do, viz., to stand by his ship until the very last. The captain now declares that he intended to return to her. His declarations, made after the event, as to his secret intentions, of which he gave at the time no sign, and which did not ripen into any act or effort to effect them, are entitled to but little weight. That he did not intend, after providing for his own safety, to wholly abandon the mate and his companions to their fate may be admitted; but that he had any intention to return to the ship for the purpose of resuming possession and command of her I cannot believe. The captain and crew had reached shore, made a fire, and had warmed and refreshed themselves. A boat did go to the rescue of the mate; but it is not certain that this was done by the master's order, and it is certain that he did not go in it. His sole object, evidently, was to pick up the men who had been left on the raft, if perchance they had not already perished. All believed that she must already have foundered.

But even if the act of the master in quitting the ship should not be deemed to amount to a final abandonment of her within the meaning of the rule, the circumstances under which the libelants refused to abandon her constitute, in my judgment, a discharge by the master of all claim under their contract for their further services. They did not intrust themselves to the raft by the master's direction. They remained by the ship in spite of his urgent remonstrances; almost against his orders. He was unable to impress them with that solicitude for their safety which he evidently felt for his own. They remained by the ship at the imminent risk of their lives, purely as volunteers, when, had they followed the master's advice and example, the ship would certainly have been lost, or drifted off, a derelict, upon the ocean.

If the salvors have not, in this case, "exceeded their proper duty,"—that is, their stipulated duty under their contract,—it is not easy to imagine

a case, short of a formal discharge, where they would be deemed to have done so. To them may be applied, *mutatis mutandis*, the words of the great chief justice in regard to a similar claim on behalf of a seaman left on board a ship deserted by her master and crew. After adverting to the general rule, which forbids the allowance of salvage to a mariner belonging to the ship which has been preserved, he says:

"The claims upon him, on the ground of contract, are urged with a very ill grace indeed. It little becomes those who devoted him to the waves to set up a title to his further services. The captain, who was intrusted by the owner with power over the vessel and crew, had discharged him from all further duty under his contract, so far as any act whatever could discharge him, and it is not for the owner to revive the abandoned claim." *The Blaireau*, 2 Cranch, 240.

I may also apply to those salvors the words of the chief justice, in the same case, with regard to the abandoned seaman: "Every principle of justice, and every feeling of the heart, must arrange itself on the side of the claim."

My judgment is that the libelants are entitled to salvage, nor is the allowance to be diminished because, when they determined to stay by the ship, they had no expectation, and but a faint hope, of preserving her. If they have acted, not from any interested or mercenary motive, but from a spirit of loyal devotion to the ship, and to their duty, which forbade them to desert her until she had perished before their eyes, their merit is enhanced on the same principle as that acted upon by courts of admiralty in awarding increased salvage where the services have been rendered, and gallantry displayed, in saving human life. I am fully impressed with the policy and necessity of disallowing the seaman's claim as a salvor when all that he alleges is that the voyage has been more than ordinarily protracted, or that his labors have been exceptionally arduous or perilous. To entertain such a claim, would give rise to endless litigation, and impose upon the courts the impracticable task of attempting to define the precise limits of the seaman's duty under his contract. But I am equally persuaded that where the master and the rest of the crew have quitted the ship, renouncing all hope of saving her, and some have remained in spite of his expostulations, and almost his commands, to confront dangers which he declined to encounter, and by so doing have saved the ship, justice, as well as the true interests of owners and insurers, demand that the courts should recognize, as a legal right, the seaman's claim to a liberal compensation for his supererogatory services.