THE HELEN FAIRLAMB.

(District Court, E. D. Pennsylvania.  May 15, 1918.)

No. 19.

1. SEAMEN ⬅➡24—WAGES—UNCOMPLETED VOYAGE.
     When seamen are to be paid for the voyage, generally speaking, nothing
   is earned, unless the voyage is completed.
2. SEAMEN ⬅➡19—WAGES—UNCOMPLETED VOYAGE.
     When a voyage is interrupted by perils of the sea, so that it cannot be
   completed, seamen hired for the voyage are entitled to discharge, and
   if their services rendered have been of benefit to the vessel they are en-
   titled to pay on an equitable basis, otherwise to no wages.
3. SEAMEN ⬅➡26—WAGES—DELAYED VOYAGE—EVIDENCE.
     Libelants, who signed for a trip for a cargo of sand, but remained
   with the vessel while she was frozen in, held, on the evidence, to have
   stayed under an agreement with the master that they should be paid, and
   entitled to recover on a quantum meruit.

In Admiralty.  Suit by Jesse Miller and others against the schooner
Helen Fairlamb.  Decree for libelants.

J. Lawrence Wetherill, of Philadelphia, Pa., for libelants.
J. Frank Staley, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge.  This proceeding is for the enforce-
ment of payment of wages due to seamen, and has received the sanc-
tion of a United States commissioner, to be disposed of upon sum-
mary hearing before the court.  The principles of law involved have
been discussed and settled in the cases of Thorson v. Peterson (D. C.)
9 Fed. 517, affirmed in (C. C.) 14 Fed. 742, Stark v. Mueller (D. C.)
22 Fed. 447, and Miller v. Kelly, Abb. Adm. 564, Fed. Cas. No. 9,577.
In the order of time in which these cases were ruled, the principles
have been formulated in the following proposition:

(1) When the pay is for the run or for the voyage, generally speak-
ing, nothing is earned unless the voyage is completed.

(2) If the voyage is interrupted by a peril of the sea, so that it
cannot be completed, the men are released from service and have the
right to their discharge.

(3) When the voyage is unfinished, because of perils of the sea, if
no benefit has been received by the vessel, no wages have been earned.

(4) If, however, the ship has been benefited by services so far as
rendered in part, the seamen are entitled to pay on an equitable basis.

(5) When the crew are entitled to their discharge, because the voy-
age cannot be completed by reason of a peril of the sea, they may be
hired for further or different service, and are to be paid as agreed,
and, if no rate of pay is mentioned, may recover on a quantum meruit.

These propositions spring out of the following state of facts:  The
libelants shipped on board the respondent schooner for a voyage to
Delaware Bay, there to take on a load of sand to be brought back to
the port of Philadelphia.  They engaged "for the run" at the stipu-

lated sums of $11 for one and $10 for each of the others. It was in the contemplation of all parties that the round trip would be made within eight days. When the loading had been about half completed, a heavy storm arose, which compelled the schooner to seek a harbor in Maurice river. After entering the river severely cold weather came on, with the result that the schooner was frozen in, and did not make her return trip until after the lapse of several months. The schooner left Philadelphia December 4, 1917, and returned on March 19th following. She brought back with her a full cargo, so that the voyage was as fruitful as expected, if the loss of time be ignored.

There is a controversy over what took place when the predicament in which the vessel was placed was realized. The admitted fact is that the men remained with the schooner, and at the command of the master performed services, not only in caring for the vessel, but also in the way of overhauling her while she was thus out of service, in the way of repairing her rigging and caulking and painting the schooner, as well as in other ways. The men returned with the schooner and helped to bring her to Philadelphia. On the way up the river, or after she had arrived in this port, and before she was unloaded, the controversy referred to came to a head, by the men being refused the pay to which they thought themselves entitled, and as a result they in turn refused to unload the schooner. The controversy, as has been stated, arose over what took place between the master and the crew, when it became apparent that the voyage was interrupted. The story of the master is that he was appealed to by the crew to know what their then future relations would be. The master testified that his reply was that he did not know, but he would get in touch with the owners and then advise the crew. His further testimony was that, following the instructions of the owners, he engaged two of the crew to stay by the vessel on the agreed terms of compensation that they were to be grubbed as long as the schooner was frozen in, but were to receive no further compensation than the $10 or $11 promised them for the voyage, and that he relieved the other libelant of all obligation to stay with the vessel and paid to him his fare to Philadelphia, so that he might return home.

It is admitted, as before stated, that all three of the crew, however, did in fact remain and were furnished their grub through a ship chandler or storekeeper, whose place of business was in the vicinity of the place at which the vessel was tied up. The position taken by the respondent, supported by the testimony of the master, is that the two libelants, whose services were engaged, are entitled to receive nothing, because of their agreement to serve while the schooner was frozen in without pay other than their grub, and that they had forfeited the agreed pay for the run because of their refusal to perform that part of their contract. The respondent's position with respect to the other libelant is that he had the right, which the respondent recognized, to stay with the ship, if he so elected, in order that he might complete the voyage, and that they were bound to maintain him while with the vessel. Because of this obligation on their part

they did maintain him, but the further defense is made that he was not entitled to his pay, because he had refused to perform his contract.

The libelants, however, aver, and the averment is supported by the testimony of each one of them, that the master, when it was found the voyage could not be completed, asked the crew to stand by the vessel during the time she was frozen in, and to remain to complete the voyage, promising them that they should be paid whatever was found to be right and proper.

There is no dispute over the proper finding of a quantum meruit compensation. Under the evidence it is found to be $30 per month. Upon the authority of Thorson v. Peterson, above cited, the libelants have made claim for 3½ months of service, at the rate of $30 per month. This is upon the basis of a finding of a contract as above outlined. On this basis the finding is made that each of the libelants is entitled to $105.

This brings the whole controversy down to the point of whether the contract for service as claimed by the crew was made or not. There is no room for dispute that a contract of some kind was made, because the master, as well as the crew, asserts a contract to have been made. The real point in controversy is: Which contract—the one set up by the crew, or the one asserted by the master? It being admitted that the services were rendered, and it being admitted that the fair value of the services as rendered was at the rate of $30 per month, it would seem that the men are entitled to $30 per month, unless they agreed to take less. If they did, they are, of course, bound by their bargain, so that the whole dispute is resolved by a decision of this fact. The weight of the evidence is presented in the statement that the master testifies to the fact of such an agreement having been made, but this is met by the positive and circumstantial denial of three witnesses. The commissioner, in his ruling, followed the weight of the evidence as thus indicated, and although it is true that no fact is to be found solely out of deference to the brute force of numbers, or by the mere counting of the witnesses arrayed on the one side or the other, nevertheless this circumstance, along with the others present in this case, inclines the mind strongly against the finding that the men agreed to serve without compensation. Inasmuch as the men were refused all compensation, unless they accepted the $10 or $11 in full of their claims, they were justified in refusing to render other services, and did not default in their contract by so doing.

Following the rule in the Thorson v. Peterson Case, we therefore find each of the libelants to be entitled to receive the sum of $105, or $315, which sum is awarded in favor of the libelants and against the respondent, with costs.