### THE LEONTIOS TERYAZOS.
### SZANTI v. TERYAZOS.
#### No. 16140.

District Court, E. D. New York.

June 26, 1942.

As Corrected July 21, 1942.

Philip Di Costanzo, of Brooklyn, N. Y. (Jacquin Frank, of New York City, of counsel), for libellant.

Frederick H. Cunningham, of New York City, for respondent.

MOSCOWITZ, District Judge.

The libellant seeks to recover for injuries sustained by him as a result of an accident on March 21, 1940, when he fell through an open coal bunker hatch while employed as a fireman on the S. S. Leontios Teryazos, which was lying at Pier 16, Staten Island, New York City.

The libellant is a citizen of the government of Hungary. He became a member of the crew of the S. S. Leontios Teryazos, which is of Greek registry, having signed on said ship at Genoa, Italy, on February 15, 1940.

■ Theodore Teryazos, the respondent, is a subject of the Kingdom of Greece. The respondent made a motion herein to decline jurisdiction. Such motion was denied with leave to renew on the trial of the action. 40 F.Supp 191, 1941 A.M.C. 1858. When the case was called for trial on February 11, 1942, respondent renewed his motion that the Court decline jurisdiction on the ground that it would be a hardship for the respondent to try the case as he could not procure any of his witnesses as the ship left New York about the time this action was begun (libel filed December 23, 1940) and since that time the ship has never been heard of. This presents a case of real hardship. Apparently the ship was sunk and the crew is dead, otherwise by this time it is quite likely that some information would have come to the respondent concerning the ship and crew. No good purpose can therefore be served by declining jurisdiction under the circumstances.

Prior to the trial respondent objected to proceeding with the trial on the ground that the libellant is a non-resident enemy alien and that therefore the courts are not open to him under the Trading With The Enemy Act, U.S.C.A. Title 50, Appendix § 1 et seq., and that the action should therefore be stayed. Decision was reserved upon this motion and the Court directed that the case proceed to trial.

The Court intends to pass upon the question of the stay and the merits of the action and the reason for this is, in the event that the Court is in error in granting the motion for a stay, the Appellate Court will have before it the merits of the action.

■ It is conceded by the parties and it is the law under the Trading With The Enemy Act that a non-resident enemy alien is precluded from suing in the Federal or State Courts. The following Bulletin of the United States Department of Justice appeared in the New York Law Journal of February 5, 1942:

620

"Bulletin of U. S.
Department of Justice

"Actions by Native Citizens or Subjects of Enemy Countries.

"Attorney-General Francis Biddle has issued a statement clarifying the right of natives, citizens or subjects of enemy countries, who are resident in the United States, to institute and prosecute suits in federal or state courts in the course of which he said:

"Any person who is an 'enemy' for the purposes of the Trading With the Enemy Act is prohibited by section 7b of that act from prosecuting suits in any court within the United States prior to the end of the war.

"For purposes of the Trading With the Enemy Act an 'enemy' is defined by section 2 to mean any person, of any nationality, resident within the territory of, or the territory occupied by any nation with which the United States is at war. Under subdivision (c) of that section the President is authorized by proclamation to include within the term 'enemy' any individuals or class of individuals who may be natives, citizens or subjects of any nation with which the United States is at war even though such individuals or class of individuals may be resident in the United States if the President shall find that the safety of the United States or the successful prosecution of the war so requires. No such proclamation under section 2 of the Trading With the Enemy Act has been issued.

"Proclamations have been issued by the President which govern the conduct to be observed by alien enemies in this country and which delegate to the attorney-general the authority to apprehend and detain specified alien enemies whom the attorney-general deems dangerous to the public peace and safety of the United States.

"These proclamations were issued under the authority granted by section 21 of title 50, United States Code [50 U.S.C.A. Appendix § 21] and careful note should be taken of the fact that they are not in any way an exercise of the power vested in the President by the above-mentioned section 2c of the Trading With the Enemy Act.

"Accordingly it is important to note that no native, citizen or subject of any nation with which the United States is at war and who is resident in the United States is precluded by federal statute or regulations from suing in federal or state courts."

See the United States Law Week, page 2493, dated February 10, 1942.

■ The first question presented for consideration is whether or not at the time of the trial of this action the United States of America was at war with the government of Hungary. The United States declared war on Germany and Italy on December 11th, 1941. Hungary, which is an ally of Germany and Italy, declared war on the United States on December 13, 1941. Since this action was tried but before the case was decided the United States of America declared war on Hungary on June 5, 1942.

The libellant at this time certainly would be regarded as an enemy alien because at the time the action was tried on February 11, 1942, the libellant was an enemy alien as the United States of America had declared war on Germany and Italy, Hungary's allies. Although Hungary had declared war against the United States prior to the trial of this action and the United States had not declared war against Hungary until a later date, the United States was at war with Hungary at the time the action was tried, within the meaning of the Trading With the Enemy Act.

■ A resident enemy alien is not precluded from suing in the Federal or State Courts during the time of war and is not precluded from interposing a defense to any action brought against him in any Federal or State Court.

The Court having decided that the libellant is an enemy alien the question for consideration is, whether or not he is a resident since an enemy alien who is a resident of the United States is entitled to sue in the Federal or State Courts so that if in fact the libellant is not a resident he is precluded from maintaining this action at this time and the trial of the action must be stayed.

■ At the time of the accident the libellant was an alien. He had a right to shore-leave of sixty days for the purpose of reshipping. Taylor v. United States, 207 U.S. 120, 28 S.Ct. 53, 52 L.Ed. 130. The libellant overstayed his ·leave of sixty days. The fact that he has lived in this country illegally since that period cannot establish him as a resident of the United States. The intention of the law is to permit enemy aliens who are residents of this country to sue in the Federal and State Courts. A seaman or any other person

who remains in this country illegally and who is subject to deportation cannot be regarded as a resident for the purpose of maintaining an action under the Trading With the Enemy Act.

The following are some of the definitions of "reside", "residing", "resident" and "residence" which are succinctly and well stated in 37 Words and Phrases, Permanent Edition, pages 277, 278, 279, 282, and 283.

" 'Resident' is defined as 'dwelling or having an abode in any place.' United States v. [The] Penelope, 27 Fed.Cas. [pages] 486, 487, [No. 16,024].

"The terms 'reside,' 'residing,' 'resident,' and 'residence' are elastic and should be interpreted in light of object or purpose of statute in which such term is employed. McGrath v. Stevenson [194], Wash. [160], 77 P.2d 608, 609.

\* \* \* \* \* \*

" 'The word "resident" is the opposite of the word "transient." The former describes a person at rest in a town, while the latter describes him in his passage through or across it.' Town of New Haven v. Town of Middlebury, 21 A. 608, 610, 63 Vt. 399.

\* \* \* \* \* \*

"Worcester defines 'resident' thus: 'Dwelling; having abode in any place; living; inhabiting; abiding; residing.' The Century Dictionary defines 'resident' thus: 'One who has a residence.' In a legal sense a residence in law is defined as 'the place where a man's habitation is fixed, without a present purpose of removing therefrom.' Brisenden v. Chamberlain [C.C.] 53 F. 307, 311.

\* \* \* \* \* \*

"Evidence established that pugilist from foreign country was mere 'temporary visitor' to United States and not a 'resident,' for purposes of establishing jurisdiction of bankruptcy court. Bankr.Act § 2, 11 U.S.C.A. § 11. Evidence disclosed that pugilist originally gained admittance as temporary visitor; that he twice declared to United States government that he was a temporary visitor; that he regarded the foreign country as his residence and so stated in an answer interposed to a previous suit; and that he described himself as of the foreign country in several contracts. In re Carnera, D.C.N.Y., 6 F.Supp. 267, 269.

\* \* \* \* \* \*

"German immigrant of 1892, who in 1915 returned to Germany and joined German Red Cross, and who was unable to return to the United States until 1922, held not a 'resident' of Germany during his absence, within Trading With the Enemy Act, § 2, 50 U.S.C.A. Appendix § 2, nor an 'enemy,' as affecting his right to recover, in suit under section 9, 50 U.S.C.A. Appendix § 9, property seized by Alien Property Custodian. Vowinckel v. First Federal Trust Co., D.C.Cal., 15 F.2d 872, 873.

\* \* \* \* \* \*

"One technically a German subject, who after residing in United States for 26 years and filing of application for citizenship, because of ill health and to settle his parents' estate, went to Germany in 1917 and was compelled against his will to remain until cessation of hostilities, and who during such time did no hostile act, held a 'transient' during his stay in Germany, and not a 'resident' of Germany, and did not lose his 'residence within' United States, and hence was entitled, under Trading With the Enemy Act Oct. 6, 1917, §§ 2, 9 (50 U.S.C.A. Appendix §§ 1–9), to sue to recover property seized during his absence by Alien Property Custodian; 'residence' being many times synonymous with 'domicile,' but not with 'citizenship,' and a 'transient' being one who is temporarily within the jurisdiction by reason of business or pleasure. Stadtmuller v. Miller, C.C.A.N.Y., 11 F.2d 732, 734, 45 A.L.R. 895."

For further definitions, see 37 Words and Phrases, Permanent Edition, pages 202–301.

 It cannot be successfully argued that the libellant who has abandoned his calling as a seaman and who has not obtained a visa as an immigrant, nor paid the head tax, nor examined is not subject to deportation. The conclusion seems irresistible that the libellant is an enemy alien and that he must be considered a non-resident enemy alien and that he should be stayed from proceeding with this suit for personal injuries on a foreign ship while in our port, for the duration of the war. See Plettenberg, Holthaus & Co. v. I. J. Kalmon & Co., D.C., 241 F. 605; Stumpf v. A. Schreiber Brewing Co., D.C., 242 F. 80.

 The Court will now consider the merits of the action. The libellant contends that he is entitled to recover under the General Maritime Law. This law gives him a cause of action for unseaworthiness and not for negligence. See The Falco, 2 Cir., 20 F.2d 362, 1927 A.M.C. 1474.

■ It is the respondent's position that the libellant was a member of the crew on a Greek ship and was a Greek seaman and his rights and remedies therefore are to be governed by the Greek law. The accident having occurred in an American port the laws of the United States apply and govern the right of recovery; the Greek law is therefore not controlling or applicable. See Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306; Uravic v. F. Jarka Co., 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312; The Navarino, D.C., 7 F.2d 743; The Hanna Nielsen, D.C., 25 F.2d 984.

The only protection afforded a seaman under the General Maritime Law, who is injured, is that the vessel shall be seaworthy. This harkens back to days of yore when seamen were not permitted to recover by reason of the negligence of their fellow servant. It is only just that an American seaman is entitled to the protection of the Jones Act which gives him a right of action for the negligence of a fellow servant. The General Maritime Law is a hard law and inhuman in many respects. It is not intended to meet present day shipping conditions. It may have been all right in days of small sailing vessels. Fortunately the time has passed when a ship owner can escape liability by establishing the negligence of a fellow servant.

The libellant was a fireman and was directed to fire one of the boilers on the S. S. Leontios Teryazos. While in the coal bunker and in the performance of his duties he tripped and fell into an uncovered and unguarded hatch as a result of which he was injured. As has been stated the libellant bases his cause of action solely upon the ground of unseaworthiness. Is a ship seaworthy whose coal hole has neither hatch covers, nor rails, nor stanchions, nor guard chains? The authorities are not uniform on this subject.

■ This Court prefers to hold and does hold that a coal hole should have some protective measure such as hatch covers, rails, stanchions or guard chains. To hold otherwise would subject seamen to serious injuries. A ship should not be regarded as seaworthy unless there is some protective means to prevent its employees from falling down into the bunker. To hold otherwise would be a return to the dark past when little protection was afforded men of the sea. Happily the United States laws affecting seamen protect them not alone from the unseaworthiness of the ship but from the negligence of their fellow servants. See The Falco, supra.

The fact that the vessel was in port can afford the respondent no comfort. While, undoubtedly, there is a greater need for protective measures surrounding the open hatch while at sea, nevertheless while it might not be as dangerous, it is of some danger to seamen even in port to work around an open hatch unless there be some protective means, and the failure to make some such reasonable protection would amount to unseaworthiness.

There are no witnesses to the accident. The only testimony offered in respect to the accident was that of the libellant who testified that he went into the coal bunker (there is no complaint about the condition of the lights—they were seemingly very good) for the purpose of procuring a shovel which he was able to see immediately near the hatch hole. He intended clearing up lumps of coal. He claimed that as he walked toward the shovel, he slipped on a lump—he called it a "crumble". He said "and I tumbled right into the hole."

The Court was not favorably impressed with the libellant's testimony. He did no testify with the frankness and candor which is required of witnesses. There is no positive testimony in the case that there were no hatch covers or protective measures or protective devices for the coal bunker. Perhaps the best that can be said in libellant's favor is that he had never seen any chains or guards. That falls far short of proof that there was none in fact available on the ship. He states that he complained to the third engineer while on the high seas and that he told him "that opening or hole ought to be covered because every time I have to pass it with the wheelbarrow, it was dangerous and it might fall in."

■ There is no question that the accident was caused through the negligence of the libellant. That, of course, would not prevent a recovery if the ship was unseaworthy. The most that can be claimed by the libellant is, that due to the negligence of some fellow servant he suffered an injury; for this he cannot recover under the General Maritime Law. The conclusion is inescapable that the sole cause of the accident was libellant's negligence. His testimony was so incredible and unreliable that the Court sitting as a trier of the facts could not base a decree in his favor on his testimony.

For the reasons above stated, that is, that the libellant is an "enemy alien" and not a "resident" of the United States, all proceedings in this case should be and are stayed during the pendency of the war between this country and Hungary.

Settle order on notice staying the proceedings in accordance with this opinion.