**USATORRE et al. v. COMPANIA ARGEN-
TINA NAVEGACION MIHANOVICH,
LTDA., et al.**

**RODRIGUEZ et al. v. THE S. S. VICTORIA.**

**THE VICTORIA.**

District Court, S. D. New York.
Oct. 16, 1945.

William L. Standard and Jacquin Frank, both of New York City, for libellants.

Burlingham, Veeder, Clark & Hupper and Eugene Underwood, all of New York City, for respondents.

BONDY, District Judge.

These libels by some of the crew of the Victoria, one for salvage and the other for wages, were consolidated and tried together.

This court has denied motions to dismiss the libels for lack of jurisdiction. Usatorre v. Compania Argentina Navegacion Mihanovich, D.C., 49 F.Supp. 275; The S. S. Victoria, D.C., 47 F.Supp. 431.

The Victoria was an Argentine tank vessel, flying the Argentine flag, and owned by an Argentine corporation. Five of the crew were Spaniards, three Portuguese and the others Argentineans. They all signed articles at Buenos Aires in Argentina for a voyage to Edgewater, New Jersey, and return.

At about 6:50 p. m. on April 17, 1942, when about 360 miles from New York and 300 miles off the coast, the Victoria was struck by a torpedo which tore a hole about 25 feet in width and 25 feet in height under the water line on her port side near the bow, opening up tanks 1 and 2.

The captain ordered the life-boats to be made ready for use and ordered the chief officer and some members of the crew to board life-boat No. 1, which was launched and made fast to the Victoria by cable on her starboard side near the stern.

At about 8 p. m. she was struck again by a second torpedo, which tore another hole about 25 feet wide and 25 feet high under her water line near her stern, opening up tanks No. 6 and 7.

The captain thereupon ordered the ship to be abandoned and he and the 17 remaining members of the crew left in life-boat No. 2.

Thereafter the life-boats drifted, were rowed or sailed away until they lost sight of the vessel and each other.

Shortly after 2 a. m. April 18, 1942, the United States destroyer Owl sighted the Victoria. At about 8 a. m. she went alongside the drifting derelict and placed aboard eight men who got her under way for a short distance. At about 7 a. m. April 19, the Owl picked up life-boat No. 1, transferred the crew to the Victoria and returned the eight men to the Owl, leaving the Victoria in command of her chief officer. At about 11 a. m. the Victoria, escorted by the Owl, got under way for New York under her own power. At 6 p. m. April 19, the United States destroyer Nicholson picked up life-boat No. 2 and transferred her crew to the Victoria. At about 10 a. m. April 20, the Owl was relieved by the Navy tug Sagamore, which continued to escort the Victoria till 9:55 p. m. April 21, when port was reached.

In the deposition taken on behalf of the respondent, the first officer of the Victoria stated that immediately after the first torpedo struck the captain ordered that the life-boats be prepared for use; that, ordered to do so by the captain, he examined the damage; that he realized it was below the water line; that it was impossible to determine exactly the damage but it must

have been great because there was fuel oil coming out of the double keel and also linseed; that after he had seen the damage he told the captain that he thought that if not struck by another torpedo the boat would not sink; that he said to the captain "Let's launch two life-boats but tie the boats to the ship by means of a cable to see what would happen"; that the captain did not take his suggestion but ordered him and some of the members of the crew to board life-boat No. 1 which was then launched and tied to the Victoria along the starboard side; that the second torpedo almost cut the ship in half; that the life-boats were launched in a very strong northwest wind and heavy sea.

■ The evidence leaves no doubt that when the captain ordered the crew to take their clothes and to launch the life-boats in a strong wind and in a rough sea, he was acting in the best of faith and that he and the crew feared and believed that the Victoria would sink and that the ship must be abandoned and that they abandoned her without any thought of returning or bringing her into port. Nor can there be any doubt that the Victoria, abandoned by officers and crew without any hope or intention of returning, was a derelict and that the members of the crew of the Owl were salvors. The Laura, 14 Wall. 336, 81 U.S. 336, 20 L.Ed. 813; The Alcazar, D.C., 227 F. 633; The Elizabeth and Jane, Fed.Cas. No.4,356.

■ This being a salvage claim, the jus gentium applies. Mason v. Blaireau, 2 Cranch. 240, 6 U.S. 240, 2 L.Ed. 266; The Two Friends, 1 C.Rob. 271; Usatorre v. Compania Argentina Navegacion Mihanovich, supra; The Bee, Fed.Cas.No.1,219. Contra: The Superior, D.C., 270 F. 283.

■■ The abandonment of the ship by the master and crew without any hope or intention of returning terminated the voyage and the contractual services of the seamen. Although ordinarily seamen are not entitled to salvage awards for saving their own ship because that service is a part of their duty, yet they do become entitled thereto when their ship has been abandoned without any hope of recovery. Mason v. Blaireau, supra; Hobart v. Drogan, 10 Pet. 108, 35 U.S. 108, 9 L.Ed. 363; The Georgiana, 1 Cir., 245 F. 321; The Umattilla, D.C., 29 F. 252; The Two Catherines, Fed.Cas.No.14,288; Cf. The C. P. Minch, 2 Cir., 73 F. 859; The Macona, D.C., 269

F. 468; The John Perkins, Fed.Cas.No. 7,360; Drevas v. United States, D.C., 58 F.Supp. 1008.

Respondent's counsel conceded that the Victoria was a derelict when the crew left her and that also under Argentinian law, if a vessel is properly abandoned, members of the crew can go back on board and become salvors.

■ All who were engaged in the enterprise and materially contributed to the saving of the Victoria are entitled to share in the salvage. They are not deprived of that right because another set of salvors refused or neglected to join in the suit. The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870.

■ The fact that the United States Government does not seek salvage inasmuch as the vessel and the cargo were under the flag of a sister republic of this hemisphere, The Victoria, 1942 A.M.C. 864, does not prejudice the rights of the co-salvors to their proper proportionate share of an award. The Blackwall, supra.

■ The award is apportionable among all the salvors, that is, the crews of the Owl, the Sagamore and the Victoria, all of whom aided in bringing the Victoria into port.

The crew of the Owl which discovered the derelict and started her on her voyage to her destination, supplied her with compressed air to start and run her motors, assisted in making the necessary repairs and convoyed her part way to New York, would be entitled to the largest part of the award, but seeks no award.

■ Though the Victoria was not an uncontrolled derelict when the libellants returned as salvors, they were called upon to assist in bringing the Victoria safely into port. They made minor repairs and rendered some services in addition to those rendered by them before their ship was struck by torpedoes. This entitles them to some award, though not to a very substantial amount.

■ It has been stipulated that the value of the Victoria when brought into port was $1,150,000. An award of $115,000 or 10 per cent. of her stipulated value, 83 per cent. distributable to the crews of the Owl and the Sagamore and 17 per cent. thereof or $19,950 to the crew of the Victoria, amounting to about $500 for each member of that crew, seems reasonable to the court. See The Lamington, 2 Cir., 86 F. 675, 685.

After the Victoria reached port, the libellants remained aboard the ship as members of her crew. About May 7, 1942, they consented in writing to continue the voyage under the command of Captain Isequilla, who replaced Captain Salamone. This consent given after the voyage was broken up by abandonment of the ship did not constitute a continuance of their former contractual employment but an entirely new arrangement. Thorson v. Peterson, C.C., 14 F. 742; The Helen Fairlamb, D.C., 251 F. 412.

After libellants filed their libel for salvage, Captain Isequilla threatened that on their return to Argentina libellants would suffer the consequences of bringing suit for salvage in an American court, that they would lose their wages, that their seamen's papers would be taken from them and that some of them would be put in jail. Though the respondents furnished the libellants with clothes and made some advances to some of them, it refused or neglected after demand to pay wages to others.

In these circumstances the libellants were justified in leaving the ship without forfeiting their wages or being considered deserters. Bush v. The Alonzo, Fed.Cas.No.2,223. See The City of Norwich, 2 Cir., 279 F. 687, 692, L.R.A.1918C, 795.

While in a harbor of the United States, the Victoria was subject to the laws of the United States, Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R 1306, and this court has jurisdiction of the action brought by the libellants to recover wages and penalties. Secs. 596, 597, Title 46 U.S.C.A.; Strathearn S. S. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607; The Sonderborg, 4 Cir., 47 F.2d 723, certiorari denied 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527. The provision of the Argentine Code, Article 1016, that no member of the crew may bring proceedings against the ship until the voyage is over under pain of loss of pay due is in contravention of these sections and ineffective when the ship is in a harbor in the United States. Lakos v. Saliaris, 4 Cir., 116 F.2d 440; Glandzis v. Callinicos, 2 Cir., 140 F.2d 111. Moreover, the inability of the Victoria to continue its return voyage to Buenos Aires after her acquisition by the United States on payment of $1,750,000 is no reason for depriving the libellants of the right to bring an action to recover wages in this court under an agreement made or renewed in the United States.

Since the record does not sufficiently establish the amount of wages and penalties to which each of the libellants is entitled, the court in the absence of a stipulation will, in accordance with the suggestions of the proctors, appoint a commissioner to determine the same.

A decree in accordance herewith should be settled on notice.