**BERTEL et al. v. PANAMA TRANSPORT CO. et al.**

United States District Court
S. D. New York.
Aug. 4, 1952.

Jerome Y. Sturm, by Abraham Fishbein, New York City, for libellants.

Kirlin, Campbell & Keating, by Ira A. Campbell, Raymond T. Greene, and Rufus Barringer, New York City, for respondents.

BONDY, District Judge.

This is a libel for salvage of the oil tanker Esso Copenhagen and its cargo by the chief engineer, the first and third assistant engineers, the junior engineer and the fireman of that vessel. At the time of the alleged salvage, the vessel was owned and operated by respondent Panama Transport Co. and all the cargo was owned by respondent Esso Standard Oil Co. (Chile) S.A.C. then known as West India Oil Co. Chile S.A.C. The libel has been withdrawn as to the Standard Oil Company (N. J.) and Standard Oil Company of New Jersey.

The case was submitted solely upon documentary evidence and an agreement as to some of the facts. It was also stipulated that libellants and witnesses for respondents would testify as set forth in certain statements admitted in evidence and that the parties consider such statements as their testimony, the same as if the persons were called as witnesses before this court.

On October 9, 1939, the Esso Copenhagen arrived in the harbor of Valparaiso, Chile and anchored between one-quarter and one-half mile from shore. Her stern was inshore and was attached by a hawser to two floating buoys. All her cargo, con-

sisting of 4,400,000 gallons of gasoline, aviation gasoline, naptha and kerosene was to be discharged to the shore tanks of the Cia de Petroleos de Chile and the West India Oil Co. Chile at Valparaiso.

The discharge of the cargo began at 11:30 P.M. on October 9, through a hose leading over the stern of the vessel to pipe lines which extended to tanks on shore. Between 12:30 and 1:00 P.M. on October 10, while the cargo was being discharged, the hose broke. Escaping gasoline and gasoline vapors covered the after portion of the ship including the galley on the poop deck where an oil stove was in operation, resulting in a severe explosion and fire. Flames shot high into the air and quickly covered the poop deck and part of the main deck. Though some of the tanks of the vessel were empty or partially empty, none was gas freed. The vessel seemed in imminent danger of destruction by fire and explosion.

The master's entry in the deck log for October 10 states that since there was a "great possibility for the fire to reach the cargo tanks", he ordered the crew and the workers from the Chilean oil companies to leave the ship and get into two launches alongside and that most of the crew and all the workers left by the launches or by jumping overboard into the sea.

On October 13 in a report to the Panama Transport Co. the master stated that the men were ordered to leave the ship "in order to save their lives" and that the master himself jumped overboard only after the last man on deck had left the ship and the flames crept nearer on the main deck.

This is contradicted in the affidavit of libellant Lund, the chief engineer, and in the report of the West India Oil Co. Chile to the Standard Oil Co. of New Jersey dated October 16, 1939, by which it appears that after the explosion, all the officers and men on deck jumped overboard, that the master was among the first to jump and that the abandonment of the vessel took place in an uncontrollable panic. None of the lifeboats were lowered. Lund alleges that the master shouted that everybody should abandon ship, ripped off his jacket and hat and jumped into the water, and that the master was among the first to jump.

It is undisputed that everyone aboard the vessel left it except the five libellants. Lund states without contradiction that the four co-libellants and one other seaman were below deck in the engineroom when the ship caught fire and that the master and the second mate admitted to him that they did not warn these men because they believed the ship would explode before they could do so.

Lund further states that he telephoned to the engineroom that the ship was on fire and was being abandoned, and that the men then came up, and that realizing the vessel was in immediate danger of explosion, the four other libellants and he decided to remain aboard and try to save it. He states that the libellants did the following to extinguish the fire:

Arne Sorensen went down to the boiler room to protect the boilers and to raise the steam to run pumps. Bertel connected the fire hose to the fire lines on deck. Laurits Sorensen ran through the flames into the pump house, grabbed a fire extinguisher, turned off the cargo pumps and the master gasoline discharge valve amidships and beat back the flames from the pump house on one side of the ship. Jensen ran through the flames and got a fire extinguisher from a passageway, and beat back the flames away from the pump house, on the side of the ship opposite to the one on which Laurits Sorensen was working. Lund ran through the flames, got hold of a fire extinguisher from another passageway and beat back the flames from the gasfilled, empty tanks, put the cover on at least one of the empty tanks that was in the path of the flames and beat back the flames from the filled tanks and away from the ventilating holes in the tanks on the starboard side. After the flames were beaten back from both sides of the main deck and away from the pump house and the tanks, libellants reached the aft-deck and Laurits Sorensen and Lund played the

water hose on Jensen and Bertel while they closed the gasoline discharge valve on the stern near the ruptured hose, through which gasoline was still spurting, and covered the ruptured hose with wet mats to stop the gasoline from feeding the flames. Lund played the hose on about ten to twelve barrels of oil to cool them off and prevent further explosions and libellants also put out the fires on the woodwork, the canvas and the heavy coils of rope and finally succeeded in extinguishing the fire.

The master's log entry and his October 13 report state that when the fire broke out, the cargo pumps were stopped and the master discharge valve shut and that the fire diminished as soon as the gasoline in the hose was consumed. The West India Co. report states that the evidence indicated that the pump was shut off soon after the explosion and that the fire was fed only by the gasoline from the burst hose, the contents of the pipe line from the pump house to the stern, and some barrels of lubricating oil on deck. That the libellants successfully fought the fire with small portable fire extinguishers indicates that the pumps had not been adding oil to the fire. The allegations of the libel which it was stipulated were to be considered as libellants' testimony, are that libellants closed the master valve and stern discharge valve but do not mention the cargo pumps.

Whatever inconsistency may appear in the testimony, there can not be any doubt that the ship and cargo were saved from destruction by the prompt, skilful and courageous action of the libellants. Standard Oil Co. of New Jersey requested the marine manager of Lago Oil & Transport Co. to conduct an investigation when the Esso Copenhagen reached Aruba, Netherlands West Indies, in November, 1939. As a result of the investigation, the latter concluded that libellants had shown very remarkable presence of mind and undoubtedly saved the ship and recommended that they should receive a bonus as had been suggested. In appreciation of their action in extinguishing the fire, libellants in December, 1939, were given bonuses amounting to two months pay, aggregating $781.

All the members of the crew and the workers who jumped overboard swam ashore or were picked up by barges, lighters or a launch which had been alongside waiting to take the master ashore. The master was picked up by a launch about twenty meters from the ship. In his log entry, he states that he tried to get hold of "some fire-extinguishing boat" and in his October 13 report that he was transferred from the launch to a navy towboat equipped with fire extinguishers. The fire had been completely extinguished before he reached and boarded the vessel. In the West India Co. report, it is stated that the fire lasted about half an hour and was completely extinguished by 1:30 P.M.

The report of the West India Co. also states that thereafter the members of the crew who had gone ashore went back and forth to the vessel as they pleased. The captain and officers had little control over them and seemed not to care what they did. Employees of the West India Co. took care of the crew when ashore, supplied them with lodgings and clothes, treated the injured and the following morning rounded up some members of the crew and sent them to the ship. Repairs were made and the discharging of the cargo began again on October 11, at 4:55 P.M., and was completed on October 12, at 4:10 P.M., and the Esso Copenhagen resumed its voyage and sailed with its crew for San Antonio at 5:50 P.M.

Seamen are under the duty to exert themselves to the utmost to save their ship and cargo. Accordingly, they are not considered volunteers entitled to salvage for services rendered in saving their own ship unless rendered after their employment has been terminated by an unmistakable discharge, Mason v. The Blaireau, 2 Cranch. 240, 6 U.S. 240, 2 L.Ed. 266; The Georgiana, 1 Cir., 245 F. 321; The Umattilla, D.C., 29 F. 252, 258–259, or by a final abandonment of the ship without hope of return or expectation of recovery, Baretich v. United States, D.C., 97 F.Supp. 600; The Victoria, D.C., 64 F.Supp. 370, reversed on other grounds, Usatorre v. Victoria, 2 Cir., 172 F.2d 434; see The Umattilla, supra, 29 F. at page 258. See The C. P.

Minch, 73 F. 859, 865. So an order by the master that the ship be abandoned, given to save life, does not by itself constitute a discharge or abandonment putting an end to the crew's duty of service unless it clearly appears that the abandonment was absolute and final. See The Lyman Abbott, D.C., 66 F.Supp. 788, 793; The C. P. Minch, 73 F. 859, 867. Thus, seamen were not entitled to salvage where the captain acted promptly after abandonment to have his ship taken care of by naval authorities, Elrod v. Luckenbach S. S. Co., D.C., 62 F.Supp. 935; Milton v. The Blue Goose, D.C., 91 F.Supp. 114, or where the captain stood by and returned to the ship when he concluded that his apprehension that the vessel would sink or be destroyed by fire and explosion was not justified, The Lyman Abbott, supra; Drevas v. United States, D.C., 58 F.Supp. 1008; The Portreath, [1923] P. 155.

The master of the Esso Copenhagen did not take time to consider what, if anything, could be done to save the tanker, before ordering abandonment. Neither the ship's papers nor any personal belongings were removed and the master and crew left in panic to avoid what appeared to be an immediate threat of destruction and death. Since the ship was in a harbor, it was possible for them to jump into the water, swim ashore or be picked up by nearby boats and then await developments which would enable them to ascertain whether they could return to the tanker with safety. See The Lyman Abbott, supra; The C. P. Minch, supra 73 F. at page 863.

When libellants came on deck, they decided that it would be possible to prevent the fire from spreading to the cargo tanks and to extinguish it. Although the evidence indicates that the fire then was or would be coming under control, as the gasoline from the burst hose and the pipe line was being consumed, there was probably still a serious threat of explosion. Libellants acted courageously and with greater presence of mind and better judgment than the master and the rest of the crew. However, to be entitled to salvage, they must be found to have been volunteers and not to have been acting in the service of the ship.

There is no indication whatsoever that libellants or any other members of the crew believed that their duty to the vessel had been ended by the abandonment.

Libellant Lund briefly noted the incident in the engine log for October 10, "Extinguished fire on tank deck, poop deck and gasoline discharge hose." While there was some lack of discipline among the members of the crew after the fire, it lasted but a short time. Discharging of the cargo began again in the afternoon of October 11, the day after the fire, and was completed on October 12, when the vessel sailed for San Antonio apparently with all the crew aboard except one man left in a hospital and one who deserted but rejoined the ship in San Antonio. Apparently the crew continued to serve on the Esso Copenhagen under the previously signed articles, there being no mention of any new arrangements, indicating that they considered their obligation of service to their ship had not been terminated by the fire. Compare The Victoria, supra 64 F.Supp. at page 373 with Elrod v. Luckenbach S. S. Co., supra 62 F.Supp. at pages 937–938.

After the captain jumped overboard and was picked up by a launch, he sought to return to his ship with fire-fighting equipment. While the fire was extinguished before he boarded the vessel, the entire episode apparently lasted only half an hour. Under the circumstances, it is doubtful that the master acted as though he had no reasonable hope of recovering the ship in any event and libellants have not sustained their burden of proving that the Esso Copenhagen was abandoned without hope of return or expectation of recovery. The Lyman Abbott, supra 66 F. Supp. at pages 789, 796.

Respondents further contend that the action is barred by 46 U.S.C.A. § 730, which provides:

"A suit for the recovery of remuneration for rendering assistance or salvage services shall not be maintain-

able if brought later than two years from the date when such assistance * * * was rendered, unless the court in which the suit is brought shall be satisfied that during such period there had not been any reasonable opportunity of arresting the assisted or salved vessel within the jurisdiction of the court or within the territorial waters of the country in which the libelant resides or has his principal place of business."

This action has been barred by the statute if there was a reasonable opportunity to arrest the vessel either in the territorial waters of Denmark or within the jurisdiction of this court before October 10, 1941. See United States, on behalf of Lord Com'rs, v. The James L. Richards, 1 Cir., 179 F.2d 530, 533–534.

The Esso Copenhagen did not come within the jurisdiction of the territorial waters of Denmark during the two years following the alleged salvage. However, it was within the jurisdiction of this court in the port of New York from February 26, 1940 to March 8, 1940; from July 24, 1940 to August 3, 1940; from August 21, 1941 to August 23, 1941.

■ Although libellants, as residents of German-occupied Denmark were not able to sue in the United States during the Second World War, see Trading with the Enemy Act, § 2(a), 50 U.S.C.A.Appendix, § 2(a); Ex parte Colonna, 314 U.S. 510, 62 S.Ct. 1373, 86 L.Ed. 379; The Rita Màersk, D.C., 52 F.Supp. 56, 59; The Leontios Teryazos, D.C., 45 F.Supp. 618, 620–621, their right to do so was not suspended until December, 1941, when the United States declared war against Germany and hence they could have sued and arrested the vessel during the two year period fixed by the statute of limitations. Verano v. De Angelis Coal Co., D.C., 41 F.Supp. 954.

Libellants, however, contend that whatever opportunity was afforded them to arrest the vessel within that time was not a "reasonable opportunity".

Libellants' home was in Denmark, their contract provided for return home at the end of eighteen months and a seaman's organization in Denmark might have helped them with their claims. They therefore urge that before April, 1940, when Denmark was occupied by Germany, it would have been unreasonable to expect them to sue here, that they thereafter feared that instituting a suit against their employer would result in their dismissal. See Coburn v. Factors & Traders Ins. Co., C.C., 20 F. 644, 646, that it might be difficult to obtain other employment as seamen here and that they would be subject to deportation to Nazi-occupied Denmark if they were unable to find employment as seamen and that they feared they would be deported.

Whether these fears were reasonable or not is difficult to determine on the present record. In any case, however, the court is of the opinion that libellants' claim must be dismissed on the merits.

Although the libellants displayed extraordinary courage and an exemplary sense of duty to the ship and their employer, it can not be held that they were or considered themselves as volunteers rather than seamen acting in the performance of their duty, hazardous as it may be. The fact that the other members of the vessel saw fit to leave the tanker did not absolve them from performing their duty to their ship in accordance with the traditions of seamanship, and the court reluctantly concludes that the libel must be dismissed.

The foregoing shall be considered to include findings of fact and conclusions of law, unless the parties desire more detailed findings, in which event they may be submitted upon notice.