## THE C. F. BIELMAN.

### (District Court, E. D. Wisconsin. May 7, 1901.)

1. SALVAGE—RIGHT TO COMPENSATION—SERVICES OF SEAMEN ON BEHALF OF THEIR SHIP AND CARGO.

   A claim for salvage services can only be preferred by persons who were not bound by their legal duty to render them; and since it is the duty of seamen, in the event of distress or shipwreck, to exert themselves to the utmost to save the vessel, cargo, and stores, they cannot become salvors, unless they have been discharged, or the voyage is terminated by the wreck of the vessel or her absolute abandonment by all, or all except the salvors, without hope or expectation of recovery.

2. SAME—ABANDONMENT OF SHIP.

   The abandonment of a stranded vessel and her cargo by the owners to the insurers is not an abandonment, within the meaning of the maritime law, which terminates the voyage, but results merely in a change of owners; and the duty of master and seamen to stand by the vessel and cargo is unaffected by such change, and services thereafter rendered by them in that regard are not salvage services which can be compensated as such by the courts, however meritorious they may have been.

3. SAME—AUTHORITY OF MASTER—PROMISE OF EXTRA PAY.

   A master whose vessel has stranded has no authority to promise the seamen additional pay, on behalf of the insurers, for work done for the saving of the ship and cargo, which it was their imperative duty to do without extra compensation; and such a promise cannot operate as a discharge of the men from the service of the ship, or entitle them to recover as for salvage services.

In Admiralty. Suit by seamen to recover for salvage services.

Libel of seamen for alleged salvage service under these circumstances: The steamer was on her voyage from Buffalo to Milwaukee, laden with coal; and the libelants were serving on her as common seamen, engaged for the round trip at $25 each per month. On the night of September 17, 1900, the steamer stranded on Fisherman's reef, in Lake Michigan, about 2 miles off shore, and about 15 miles from Washington Harbor, under no stress of weather. The master took five of the crew in a yawl to secure help; placed his order for a tug and a vessel for lightering, returned next morning, and ordered the crew to commence throwing the coal overboard; and the libelants concur in the statement that the master and mate said it was "insurance work," and they must "do the right thing," and would be treated right; that "it is seventy-five cents per hour." But the master denies that any such statement was made by him, or in their hearing. The libelants worked during that and succeeding days up to the liberation of the steamer on September 22d,—not constantly, but from time to time; and as the steamer was scuttled, as a precautionary measure, and the sea washed the decks during part of the time, the work was difficult as well as unusual, but involved no imminent peril. One day and night, the libelants testify, there was quite a gale, interfering with operations; and a portion of the crew went ashore for the night, at the instance of the United States life-saving crew, fearing danger aboard if the storm increased, returning to the vessel next morning. A tug with lighter and 40 men reached the steamer September 18th at 6 p. m., and a load of coal was taken on and carried to port next day; returned September 20th, and another cargo was taken, coal being shoveled into the lake meantime. A wrecking outfit arrived September 20th, with further help; and the steamer was released September 22d, arriving at Milwaukee September 23d with about one-third of her cargo, and was put into dry dock for repairs. At Milwaukee the three libelants declined to return with the steamer. Two demanded their pay, and were paid at the contract rate, and gave receipts. The other, William Batchelder, claimed extra pay, refused to accept otherwise, and the answer of the respondent tenders his wages at the contract rate, and the amount is deposited for his

Jackson B. Kemper, for libelants.
Markham & Hamilton, for claimant.

SEAMAN, District Judge (after stating the facts). The libelants were seamen engaged in the performance of their duty to ship and cargo, as such, when the alleged service in the nature of salvage was rendered. The doctrine is well settled that their duty and allegiance were due continuously throughout the term of engagement; that it was imperative, in the event of distress or shipwreck, to exert themselves "to the utmost to save the vessel, cargo, and stores," and their failure so to do is declared by statute a bar to any claim for wages. Section 4525, Rev. St. Salvage services can be performed only "by persons not bound by their legal duty to render them" (2 Pars. Shipp. & Adm. 264), and seamen "are not allowed to become salvors, whatever may have been the perils or hardship or gallantry of their services in saving the ship or cargo," as remarked by Mr. Justice Story in the early case of Hobart v. Drogan, 10 Pet. 108, 122, 9 L. Ed. 363, unless their connection with the ship is dissolved. The authorities on the subject are reviewed in the case of The C. P. Minch, 20 C. C. A. 70, 73 Fed. 859, 865, and the opinion thus states the deductions therefrom:

"In every case where compensation in the nature of salvage has been awarded to seamen, the voyage has terminated by the shipwreck of the vessel, which has either gone to the bottom or left her bones on the shore, or she has been abandoned by all, or by all except the salvors, under circumstances which show conclusively that the abandonment was absolute, without hope or expectation of recovery, or the seaman has been by the master unmistakably discharged from the service of the shipowner."

The fairness of this summary is conceded in the brief submitted on behalf of the libelants, but it is contended that the testimony presents a case within the exceptions, based upon the twofold assumption (1) that a so-called "abandonment" to the underwriters appears; and (2) that such fact, in connection with the alleged conduct of the master, operated as a discharge of the seamen "from the service of the shipowner." I am of opinion that neither of these theories is tenable; that the first is unsupported by proof, and the second is unfounded either in law or in fact. Under the law of marine insurance, the property at risk may be abandoned to the insurer in cases of constructive total loss, and such act amounts to "the cession by the insured of all his interest in the subject insured to the insurer." 1 Am. & Eng. Enc. Law (2d Ed.) 5. But there is no testimony in this case of such an abandonment in fact, nor of circumstances calling for its exercise; and the utmost that can reasonably be inferred is that underwriters were duly informed of the stranding, and either furnished or approved the relief expeditions. If so, they were acting within their right as insurers for the protection of their interest in the property, whether vessel or cargo or both, and not as salvors or volunteers. The Lydia A. Harvey (D. C.) 84 Fed. 1000. An abandonment to the insurers, however, merely results in a change of owners, and the duty of master and seamen to stand by the ship and cargo is unaffected by such change. Their service is due to both and to all interests involved in the venture.

Moreover, as remarked by Mr. Justice Grier in Clarke v. Fashion, 2 Wall. Jr. 339, Fed. Cas. No. 2,851, the abandonment thus referred to is confined to the insurance contract, and "has never been imported into courts of admiralty, and has no application to cases" otherwise.

In the case at bar it is manifest that the steamer was not "absolutely abandoned, without hope of recovery," and that neither master nor seamen so regarded the situation; but she was on the shoals, in September, when storms were to be expected and with a storm threatening, and it was well understood that speedy release was essential. The duty was unmistakable and urgent for the utmost exertion on the part of master and crew to that end, and without demand or promise of extra compensation. If the master, under such stress of circumstances, promised the seamen better pay at the expense of the insurers, as the libelants testify, the promise was unwarranted. So made, whether exacted or volunteered, it merely called for the performance of an imperative existing obligation, and, at best, was without consideration. Therefore, while the proof preponderates in favor of the alleged promise, I am satisfied that it can receive no judicial sanction as a binding agreement, or as a discharge in any sense from the service of the ship. The libels must be dismissed accordingly, but no costs will be charged. The amount of the tender in favor of the libelant Batchelder will be paid to him.