### THE EASTERN SHORE.

(District Court, D. Maryland.    April 23, 1926.)

1. **Salvage** ⊙⇒18—Crew alternately operating two ferryboats held attached to both and not entitled to recover for salvage services rendered to either.

Claimant owned two steam ferryboats. During the summer both were operated, but in winter one crew was laid off and only one boat was operated, sometimes one and sometimes the other; the crew being transferred. *Held,* that the crew were attached to both vessels, in such sense that its members could not recover for salvage services rendered to either.

2. **Salvage** ⊙⇒18—Libelant held member of crew of ferryboat, and not entitled to recover for salvage services.

That member of operating crew of ferryboat was ordered to report the next day on another boat, not in use, for temporary service in preparing her for repairs, did not make him any less a member of the crew of the other boat.

3. **Salvage** ⊙⇒18—Libelant, though off duty, held member of crew of ferryboat, and not entitled to recover for salvage services.

A member of the crew of a ferryboat, who resided on shore and ceased work on the boat at 6 o'clock each evening, did not cease to be a seaman in her service during his off hours, or to owe her service as such in an emergency.

In Admiralty. Suit by Edward Clothier and others against the ferryboat Eastern Shore; the Baltimore & Eastern Shore Ferry Line, Inc., claimant. Decree for respondent.

Libel was filed against the ferryboat Eastern Shore by Edward Clothier and others for salvage services rendered on January 6, 1926, in salving the Eastern Shore from destruction by fire at Rock Hall, Kent county, Md. The Eastern Shore and Baltimore are both owned by the Baltimore & Eastern Shore Ferry Line, Inc., and both vessels were operated in the summer time, with two separate crews, between Rock Hall and Baltimore. During the winter one boat was laid up and only one crew was kept. Libelant was a member of this permanent crew, acting as oiler. On the evening of January 6, 1926, the Baltimore had some boiler trouble, and upon arriving at Rock Hall orders were given to lay up the Baltimore and prepare the Eastern Shore for the trip on the following morning. As the result of this order, the Eastern Shore was moved into the regular ferry slip and the Baltimore was tied up at the landing, just across from the ferry slip.

About 8:30 that same evening, the Baltimore was discovered to be on fire by the watchman of the Eastern Shore, who immediately gave the alarm by sounding the whistle of the ferryboat. Clothier was among the first to arrive at the wharf, followed shortly by the intervening petitioners and other members of the crew of the Eastern Shore. It was at once seen that it would be impossible to save the Baltimore, which was a mass of flames, and that only prompt action would save the Eastern Shore, as the wind was blowing directly from the Balti-

more towards the Eastern Shore, with a distance of 50 feet or less separating them. Libelant immediately went down into the engine room and with the help of the intervening petitioners got steam up in the boilers, and was able to get the ferryboat under way and out of the slip in time to save it from burning.

The defense to the claim to salvage was that libelant was a regular member of the crew, and as such was not entitled to salvage for salving his own vessel. Clothier claimed that he was employed by the day, from 6 in the morning until 6 in the evening, which put him in a different position from the ordinary member of a ship's crew, and further that he had been ordered to go aboard the Baltimore the day following the fire, in order to clean and prepare her boilers for inspection.

B. Harris Henderson and A. Schoneis, both of Baltimore, Md., for libelants.

Janney, Ober, Slingluff & Williams, of Baltimore, Md. (Robert W. Williams and Robert France, both of Baltimore, Md., of counsel), for respondent.

SOPER, District Judge (after stating the facts as above). There is one aspect, at least, on which the court is ready to announce a decision. There is no doubt in my mind that salvage services were rendered on this occasion. It is practically admitted that the Eastern Shore was in grave danger as she lay in the slip, since there was a comparatively short distance or space intervening between her and the burning ferryboat, which, I understand from the testimony, lay just outside of the slip, and the witnesses on both sides seem to agree that, had the Eastern Shore not been moved pretty promptly, her superstructure would have caught fire and she also would have been consumed.

[1] The real question as to Clothier is whether he is entitled because of his relation to the ship. There are two points which counsel seem to be agreed upon. The first is, of course, that a seaman attached to a ship is not entitled to be paid for salving it; and the second is that a seaman on board one ship is entitled to be paid salvage for salving another ship belonging to a common owner. The query then arises whether Clothier belongs to one or the other of these two classes. In my opinion, he belongs to the first class.

It is true that there were two vessels, and that when both were being operated in the summer time there were two separate crews, or at least each vessel was fully manned. This fire happened, however, after the expiration of the summer season—in fact, in the dead of winter, on January 6th. At that time there was but one crew, sufficient in number to comply with the regulations for the 13-hour service per day. That crew was an interchangeable crew, according to the undisputed evidence. During a portion of the period, when but one boat was in operation, in the earlier part of the winter season, the Eastern Shore had been used, and Clothier and the other men who have testified in this case constituted her crew. During a later period, including January 6, 1926, the Eastern Shore was laid up, and the Baltimore was being used, and the crew was transferred to her. And that was the case, certainly, up until the Baltimore returned to her dock from her last trip to this city. During this last trip, while returning from Baltimore to Rock Hall, she seems to have suffered some injury to the boiler, which made it necessary to lay her up. Thereupon the crew, with the exception of Clothier, were notified to report the next day for service on the Eastern Shore, which was to take the Baltimore's place in active service. Clothier was given a temporary assignment to go on board the Baltimore the next morning and to help make the ship ready for the men who were to repair the boiler. Counsel for Clothier naturally say, therefore, that he was really a seaman on board the Baltimore, rather than a seaman attached to the Eastern Shore.

But I do not think that it can be said that this crew was specifically attached or exclusively attached to either vessel. Manifestly they were there to be used on both vessels, as the occasion might require. Indeed, that is very well illustrated by what happened the afternoon of the day on which the vessel was consumed. When the Baltimore was brought back to Rock Hall, it was known that she had to be laid up for repairs and could not sail the next day. It then became desirable to put her at the moorings of the Eastern Shore, and to move the Eastern Shore into the regular ferry slip, so that she would be ready to sail the next morning. How was that done? It appears that a portion of the crew then sailing on the Baltimore was then transferred to the Eastern Shore. As they had apparently but one engineer, or, at least, as only one regular engineer was available, Clothier was ordered to go on board the Eastern Shore to operate her engines for this short distance, moving

from outside of the slip into the slip. Then after that was done he went back on the Baltimore.

It seems to me that, if we were to carry the theory of the attorneys for the libelant here to the logical extreme, we might conceivably have this situation: Suppose that the fire had occurred as these vessels were being moved around. Suppose that, while Clothier was transferred from this temporary service in moving the Eastern Shore around, and was then on board the Eastern Shore, and a member of the Eastern Shore crew, the Baltimore had caught on fire. It would be quite logical, in view of the plaintiff's attorney's contention, to say that, if he had then left the Eastern Shore, and had gone on the Baltimore, and put out the fire, he would have been entitled to salvage services, because at that moment he was really a member of the crew of the Eastern Shore, and not attached to the Baltimore. I do not think you can carry a matter to that extreme, and, whilst this case is not quite so extreme, it is sufficiently near it to make the position untenable in my opinion.

[2] I do not think the mere fact that Clothier was ordered to report to the Baltimore on the next morning, to do temporary service to get the boilers ready for the boiler makers, and was then, as I understand the testimony, after finishing that temporary job, to resume his duty as oiler on Eastern Shore, makes him any the less a member of the crew of the Eastern Shore than the other men, who are actually told to report on the Eastern Shore and bring her to Baltimore the following day. It is a matter of passing interest that, since the fire consumed the Baltimore, Clothier actually did report for duty to the Eastern Shore and helped to bring her to Baltimore.

My attention has been called by counsel to the case of the Narmada, 1924 A. M. C. 710, in the lower court, and on appeal at (C. C. A.) 10 F.(2d) 152, 1926 A. M. C. 637. This was a case in which a summer cruising yacht was laid up for the winter. She broke adrift, and was saved by the extraordinary exertions of her captain and by certain other men, who were temporarily working on her, and it was held by the lower court and on appeal that the captain was entitled to salvage services. The case certainly is pertinent, but the facts, I think, are sufficiently different, so that it is not binding here. The captain of the yacht was paid a monthly salary throughout the year; but he had no duties in the winter time; and the

boat was at her winter moorings. He was, in fact, effectually off duty, and was, in the opinion of the court, entitled, therefore, to the same salvage as if he had no connection with the boat. I think that case is quite different from this, so far as the question of duty is concerned.

[3] It has been suggested here that Clothier, although he might be considered a member of the crew of the Eastern Shore, was under no obligation to her on this occasion, because the fire took place after he was through with his work for the day. This being a ferryboat, the members of the crew, many of them, found it convenient to live near the wharf on the Eastern Shore, and Clothier did so. I am not prepared to go to the extent of saying that a man who is regularly employed day after day on a boat, whose duties, however, do not require him to live on the boat, should not be considered to be a seaman attached to that boat, and having a duty to the boat after hours.

The same considerations which have led the court to hold that a seaman is not entitled to be paid for salvage work on the boat to which he is attached apply, it seems to me, in this case, and I do not believe that it is a fair ruling that this man should be considered to be entirely in the position of a private unattached person between, let us say, 6 o'clock in the evening and 6 o'clock the next morning. What Clothier did was highly commendable, and the salvation of this boat, practically unharmed, was certainly due, in large measure, to his services, but I think he rendered them as the result of a duty which he owed the ship, and therefore cannot be paid for them.