## DREVAS v. UNITED STATES et al.
### No. 2676.

District Court, D. Maryland.

Feb. 9, 1945.

Hollen B. Hoffman, C. Arthur Eby, and T. K. Nelson Sterling, all of Baltimore, Md., for libelant.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., and Arnold W. Knauth, Atty., Department of Justice, of Washington, D. C., for respondents.

CHESNUT, District Judge.

The libelant in this case, a member of the crew of a Liberty ship, claims a salvage award for participation with other members of the crew in bringing the ship safely to port after she had been damaged at sea by enemy action.

Ordinarily seamen are not entitled to salvage awards for saving a ship of which they constitute members of the crew because that service is a part of their duty. It is only in extraordinary cases that they become entitled to an award as salvors. The libelant contends that this is such an exceptional case.

From the evidence in the case I find these facts. The libelant, Peter Drevas, a seaman with six years' prior experience as a wiper, fireman-water tender and oiler, at various times, signed articles as a member of the crew of the Liberty ship "Matt W. Ransom", at Newport News, Virginia, on February 25, 1943. On February 26, 1943 the ship sailed from New York for Bermuda where it joined a convoy bound for Casablanca, Africa. The ship was of the conventional type of construction of Liberty ships, and was about 10,000 tons. Its cargo consisted largely of munitions. Drevas was specifically employed as a wiper for day work five days a week. The working crew of the ship was forty-four in number and the total ship's company was seventy-seven.

On April 11, 1943 about 3:20 P.M. while the ship was about 50 miles from Casablanca, she was hit by a submarine torpedo or struck a mine, which tore a hole about 14 by 15 feet in size in her starboard bow, at hold No. 1. This hold filled with water. The impact also buckled the plates in hold No. 3 which likewise filled to the water level. As a result the bow of the ship went down ten or twelve feet and the stern up about four feet. The propeller was not out of the water and the deck was above water four or five feet. The sea was calm with only a small swell and the wind was gentle from the south. The temperature was warm or mild. The ship continued to settle for about twenty minutes after the explosion and the master, an experienced man, not then knowing the extent of the damage, ordered all hands into the boats to await further developments. All the ship's company got into five life boats. The momentum of the ship carried her forward and some distance away from all but the last of the boats to be launched. This last boat contained the master, one of the engineers, Drevas, the wiper, and eight other members of the crew or of the ship's whole company. The master's boat pulled away from the ship for about 200 yards and kept abreast of it by rowing. The other life boats fell behind. On leaving the ship the master's order was to stand by in the boats. After about half

an hour the master saw that the ship was not further sinking and asked his boat's company if they were willing to go back and endeavor to man the ship and take her into port if possible. They all responded that they were willing to do so. The boat was then rowed back to the ship, and seven of the company went aboard. Two men in the boat had suffered some injuries and two others were left in the boat to care for them. On reboarding the ship it was found that the engine room was not damaged and the ship could be operated.

The four remaining life boats were taken in tow. But after two or three hours the tow line broke and the persons in those boats were then taken aboard a destroyer. Before they were taken in tow some of the crew inquired of the master whether he needed more men on board the ship to operate her. But in view of the still remaining uncertainty as to the ship's condition, the master thought it unwise and unnecessary to take on additional members of the crew and thus unnecessarily risk the lives of or injury to more than the seven on board.

The ship was safely taken into the port of Casablanca where she arrived about 11 P.M. the same day. The master and crew remained in Casablanca for about two months when they were taken back to New York on another boat. All the crew received their full wages until their return to New York. The libelant's wages were at the rate of $87.50 per month with an additional $100 per month as a war zone bonus, and an additional 10% by reason of the so-called "penalty" cargo.

After arriving at Casablanca the master wrote up and signed the "smooth" log of the ship, narrating the day's occurrences. The material parts are as follows:

"After the explosion, the ship settled heavily by the head. All hands ordered to boat stations and stand by to lower boats. As vessel kept going down by the head, ordered boats lowered into the water and abandoned ship at 16.05, and got clear off the vessel. 16.10, all hands off the ship including the ship's dog, Bismark, and a cat, Blackie. 16.20, ship settled in same position and no further settling was noticeable. Asked for volunteers to reboard the ship and try to take her into port. 3rd Asst. Engineer, Albert V. Gately; Wiper, Peter Drevas; A. B. Clive C. Boyer; Ensign, Earl J. Kohn, U. S. N., and Seamen John J. Enright and J. C. Rehnart of U. S. N. readily volunteered to go. Also others in the boat were ready to go, but two men were slightly injured (gun crew) so I left 2 others in the boat to look after them. 16.30 had steam up and proceeded on slow speed toward port. Later, one escort vessel leading ahead and large tug, standing by. * * * Coming in, 3rd Asst. Engineer Gately, attended to the engines. Wiper P. Drevas to the fires. A. B. Boyer was at the wheel. Ensign Kohn and two seamen attending to the various straggling lines, that were hanging over the side. Others in the life boats offered to come aboard to help, but I felt confident that I had sufficient help to get the ship in. Also, saved time of getting in further risk to lives should further explosions occur."

The ship received some repairs in Casablanca and was subsequently sailed back to New York by another crew but never having been fully repaired was subsequently sunk to form a part of a breakwater. The cost of construction of a Liberty ship new is approximately $1,500,000. The value of the cargo was possibly that much more. The libelant did not produce affirmative proof as to the value of the ship in her damaged condition on arriving at Casablanca; but it was agreed at the hearing that further opportunity to produce this more definite evidence of the value of the ship and cargo should be given the libelant if the court was of the opinion under the facts found that the libelant was entitled to a salvage award.

On these facts my conclusion of law is that the libelant is not entitled to a salvage award because the ship was not abandoned without hope of return, nor were the crew discharged from their services.

The ship belonged to the United States Government and was operated by Smith & Johnson, Agents. The suit is a libel in personam against the Government under the authority of 46 U.S.C.A. §§ 741, 742 and 781. See also 46 U.S.C.A. §§ 727–731.

There is apparently no prior reported judicial decision of the Court of Appeals of this Circuit dealing with the particular subject matter of this case, a claim for salvage by a member of the crew of the vessel saved; but the law on the subject is well settled by many English and

American admiralty cases. Members of the crew of a vessel are not permitted to participate in salvage awards unless their ship has been abandoned without hope of recovery, or the crew has been legally discharged from further services by the master. The reason for the rule is that it is within the duty of the crew in case of danger to the ship to exert themselves to save the ship. This rule was recognized in the instant case in the formal agreement between the Seafarers International Union and Smith & Johnson, Agents,—

"Any work necessary for the safety of the vessel, passengers, crew or cargo, or for the saving of other vessels in jeopardy and the lives thereon, shall be performed at any time and such work shall not be considered overtime."

The established rule is succinctly stated in Robinson on Admiralty, p. 724:

"Another phase of the doctrine that the service must be done 'voluntarily' concerns the particular persons who may be entitled to salvage. Those who are under obligation to serve are disentitled. The most obvious of these who are disqualified are the imperilled ship's own crew. Let the ship be imperilled and their duty to save it increases with the peril. Why and how she is in peril is of no consequence."

In this case it is clear the ship's crew was not discharged by the master in consequence of the damage and before the ship safely arrived at Casablanca. Counsel for the libelant, however, contends that the ship was abandoned in consequence of the damage. Some color is given to this contention by the recital in the ship's log; but a consideration of the whole evidence in the case makes it entirely clear that the abandonment of the ship was not without hope of return but was a precautionary measure for the safety of the ship's complement in view of the then present uncertainty as to whether the ship would sink as a result of the damage. The admiralty cases firmly establish the proposition than an abandonment of a ship which justifies a salvage award to the crew must be sine *spe revertendi aut recuperandi.* Some early English admiralty cases to this effect are The Neptune (Lord Stowell) 1 Hagg.Adm. 227, 236; The Florence, 16 Jur. 572, an admiralty opinion by the well-known Dr. Lushington, and The Warrior, Lushington's Reports, 476, 167 Engl.Rep. 214. In the still leading American case of The C. P. Minch, opinion by Circuit Judge Lacombe, 2 Cir., 1896, 73 F. 859, 865, the prior cases, both English and American, are reviewed in detail and the result is succinctly summarized as follows:

"From this view of the authorities, it is apparent that, in every case where compensation in the nature of salvage has been awarded to seamen, the voyage was terminated by the shipwreck of the vessel, which has either gone to the bottom or left her bones on the shore, or she has been abandoned by all, or by all except the salvors, under circumstances which show conclusively that the abandonment was absolute, without hope or expectation of recovery, or the seaman has been by the master unmistakably discharged from the service of the shipowner."

The later cases both in England and the United States have not departed from the rule. Particularly in point is the case of The Portreath, L.R.Probate Div. (1923) 155, a case quite similar on the facts. Mr. Justice Hill in concluding his opinion said:

"In my view when one finds a master giving orders to his crew to abandon ship and go on board another vessel because he thinks his ship is sinking, and then within a short time, on maturer judgment, he arrives at the conclusion that the ship is not sinking, there is no foundation for saying that there was any final abandonment of the ship. There was no dissolution, no determination of the contract of service. The fact that the master called for volunteers instead of ordering the crew to go back appears to me to have no bearing on the question. The claim of these plaintiffs will be dismissed with costs."

The later cases in this country are to the same effect with respect to what constitutes an abandonment of the ship in this connection. The No. 105, 5 Cir., 97 F.2d 425; The Mary M., D.C.N.D.Cal., 1938 A.M.C. 1237; The Tashmoo, D.C., 48 F.2d 366; The C. F. Bielman, D.C., 108 F. 878; Gilbraith v. Stewart Transp. Co., 7 Cir., 121 F. 540; The Macona, D.C., 269 F. 468; The Superior, D.C., 270 F. 283; The Eastern Shore, D.C., 15 F.2d 82 (Judge Soper). See also The Connemara, 108 U. S. 352, 2 S.Ct. 754, 27 L.Ed. 751. A comparison of the facts in many of these cases with the facts of the instant case will clearly show there was no such abandonment in this case that would give rise to a salvage award to members of the crew of the ship.

It is only under quite extraordinary circumstances that members of the crew of a vessel are entitled to a salvage award. It has been held that a crew retaking their vessel from a captor or from a pirate may be allowed salvage. Robinson, supra, p. 724, note 48. In The Georgianna, 1 Cir., 245 F. 321, much relied on by counsel for the libelant here, the crew were allowed salvage where the court found the ship had been absolutely abandoned but the facts are clearly distinguishable from those of the instant case.

The only claim that is advanced in this case is for a very substantial salvage award. No claim is made for additional compensation in the nature of wages for overtime pay or for services as a fireman rather than a wiper. No claim for salvage has been made by the master or other members of the crew who participated in taking the ship into port. All of them, including the libelant, are certainly entitled to high commendation for the performance of their services in this case. Attention is called to the fact that they volunteered for the service and were not ordered by the master to undertake it. The evident reason why the master did not give an order was the then uncertainty as to the continued safety of the ship. This uncertainty was substantially removed when on reboarding the ship it was found that the engines were undamaged and the bulkheads in the damaged holds were intact.

For these reasons I have concluded that the libel must be dismissed. Counsel may present the appropriate order in due course.