NIEWENHOUS et al. (LEESNITZER, Intervener) v. UNITED STATES et al.
THE LYMAN ABBOTT.
No. A-17028.

District Court, E. D. New York.
May 23, 1946.

of steel and other substances, including a 6-ton section of steel deck plating; her fire hose lines were broken; cargo-booms, hatches and other gear were smashed, and her position was one of dire peril, since her cargo consisted of explosive war materials, including gasoline, in part. Under those circumstances, the Master ordered the crew to abandon ship, and conducted all hands ashore in the ship's boats and rafts, including those who had been wounded.

The question for decision is whether the Master in fact yielded up his ship in a final and conclusive sense, and in the belief that it was lost, and released the members of the crew from all further duties so that they became free agents to contract for any service that might offer itself; for example, as volunteers in a salvage operation.

Purrington & McConnell, of New York City (Frank J. McConnell, Harold W. Bissell, and James D. Brown, all of New York City, of counsel), for libelants.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Edwin Longcope, Sp. Asst. to U. S. Atty., of Brooklyn, N. Y., and Gordon L. Becker, of New York City, of counsel), for the United States.

BYERS, District Judge.

This is a salvage cause instituted by 9 out of 27 members of the crew of the S.S. Lyman Abbott, of whom one has since withdrawn his claim, based upon services said to have been rendered as salvors to the said ship in removing her from her anchorage in the harbor of Bari, Italy, on December 3, 1943, and thereafter, as will be stated.

The Abbott was owned and operated by the United States of America at all times material to this controversy, and the cause has been withdrawn as to the other respondents named above.

The Abbott was one of a convoy of merchant ships in the said harbor, which were subjected to a devastating air raid by enemy planes of which some were bombers, at about 7:00 P.M. on December 2, 1943; while the Abbott was not bombed, one man was killed and others were wounded and she suffered damage from flying debris from other ships, namely, pieces

The case for the libelants has been carefully scrutinized in the belief that the burden is upon them to establish by clear and convincing evidence that the abandonment of the ship was ordered by the Master because he must have believed that there was no reasonable hope that he could recover his ship and therefore elected to depart from it without hope of being able to bring the voyage to a successful conclusion and to discharge his sorely needed cargo that it might come into the hands of those who were conducting the Nation's battles.

That is not too stringent a requirement when it is remembered that every motive to serve the Nation in its hour of peril must be ascribed to the man with whom the decision lay.

It is thought that the Master of a cargo ship in time of peace—whose judgment when facing peril would at most be visited upon underwriters—would not be constrained by those compulsions of loyalty of which the Master of the Abbott must have been aware when he made the decision now under examination.

That which was indeed taking place in his mind of course cannot be determined with any degree of precision, since all that we have to support conjecture is confined to what he said and what he did; nor is it completely convincing to rely solely upon

his own statement concerning his mental operations, as he recalled them nearly five months later when his deposition was taken; what is known of the circumstances as they existed at the time, and what may be described as the probable mental operation of the Master, afford at best an opinion as to what may be fairly attributed to him by way of intention, in the hope that the aggregate of these reflections will not be wide of the truth.

Considering first the testimony of the libelants, it will be observed that they comprehend in numbers but one-third of the crew on the homeward voyage, and of those 9 individuals but 4 were called as witnesses, namely:

Belobraydich, 3rd cook and later Steward,

Lishman, Utility Messman,

Link, Ordinary Seaman,

Salkay, Radio Operator.

Niewenhous, originally a libelant, withdrew from the cause, and wrote a letter to proctors under date of April 4, 1944 (Libelants Exhibit 1) stating:

"In regard to our recent conversation in which I signed a letter for damages in a salvage case regarding the S/S 'Lyman Abbott.'

"After giving it more thought, I have come to the conclusion that the idea is unreasonable inasmuch as I did nothing except that which I was hired to do.

"Consequently, I wish to withdraw my name from the proceedings."
He was a deck cadet midshipman.

The libelant Leesnitzer, a deck engineer, was admitted to the cause as a libelant (See order of July 26, 1944).

To establish the complete and final abandonment of the ship by the Master, and the release of the crew from their obligations arising from the shipping Articles, reliance is had upon the following:

*Belobraydich:*

Referring to the trip in the life boat from the Abbott to the jetty, he explained that the boat was filled with water on which there were oil slicks, and that there were men abandoning other ships, and then the following:

"Q. Was there any conversation with the captain or did the captain say anything on the way in from the Lyman Abbott to the jetty? A. Yes.

"Q. What was said? A. He made the remark, 'All is lost and I feel sorry for the poor fellows.'

"Q. And did you see any men from other ships in the waters around you as you went in toward the jetty? A. Yes, sir, there were two fellows not too far away, swimming, and they were calling for help. The captain said 'I wish you would pick up the poor fellows,' but we did not do it."

After landing at the jetty, he says that no orders were given by the Captain or the First Mate with respect to where the crew should go or report.

He testified that there were many men from other ships and likewise British soldiers at that place, and that after the wounded were taken care of he decided to go toward town and find some refuge, and that he did not know where the rest of the men from the Lyman Abbott went.

Of course this could not be true, as he met several of them at the Fleet Club later.

He said that the First Mate was with him (the witness) part of the time, an indefinite period. That he first went to the Navy House and got some dry clothes, but he did not see either the Captain or the First Mate there, and he went to the Fleet Club to get refreshments, and that he did see the Captain and the First Mate at that place, where the former gave him a brief case "and he told me to care for it with my life and under no conditions to give it to nobody or anybody. * * * It contained the ship's papers. * * * He likewise made the remark that we could get a new ship."

The witness later returned to the Navy House, where he saw some of the crew of the Abbott and the First Mate and the Purser and a great number of British soldiers. He stated that the First Mate said "We did not have enough men," which the witness understood to mean, to take the ship out of the harbor, and then the witness

said that he himself would go back to the Fleet Club and ask for volunteers. Before doing that, he turned the brief case over to the Purser after the latter had asked what it was that he had in his hand. The witness said: "The captain told me to take care of them and not give them to anybody. He (the Purser) said, 'Leave them with me. I use the papers all the time anyway.' I hesitated but I gave him the papers and I went to the Fleet Club."

There he started talking to different individuals and asked them to volunteer to come back out and take the Lyman Abbott out of the harbor, and he spoke to three of them, and then apparently to four others, because he said that, when he started back out of the door, there were seven in the group, but only five arrived at the Navy House; there the witness reported to the Mate, who again said that there were not yet enough men "and then the purser volunteered to go back and talk to our boys."

Eventually this group went back to the ship, although he could not give the exact number constituting the party, but 27 in all, including the Captain, took charge of the Abbott on December 3rd, as has been stated.

When the return trip to the vessel was made, there were ships still afire and an oil slick was still burning on the water.

It will be seen from the foregoing summary that only one statement was attributed to Dahlstrom, the Master, and one action, namely, the delivery of the ship's papers to the witness. Other than that, this particular testimony does not purport to expose the mental processes of Dahlstrom by word or deed.

*Salkay:*

He made his way from the Abbott in the No. 1 life boat, which contained neither the Captain nor the First Mate; and when he reached the jetty, the Captain was already there and there was a general conversation participated in by all hands in the vicinity of the Captain, but nothing specific was developed. As the witness explained, "All we were concerned with at that moment was with the safety of ourselves and of the wounded." Arriving at the Navy House, he said that he exchanged words with Nichols, the Third Engineer, who told him as to his life jacket: "Hold on to that, that belongs to you now * * * because anything that you take off a ship, when you abandon ship, it becomes your property." There was some further conversation along this line, and the witness said that "the Captain showed his displeasure by stating, 'all that you are thinking of is your own personal property and here we have lost a whole ship.' That shut me up."

In the cross examination the following occurred:

"Q. Well, just one simple question, whether the captain told you that you were discharged from the further service of the ship? A. No not in those words.

"Q. In any words? A. I was led to believe that I was on my own.

"Q. I did not ask you that, what you were led to believe; did the captain tell you that? A. The only answer that I can say to that is no."

This witness returned to the Abbott as a member of the party last above referred to.

When he was paid off in New York, he protested that he had not received all the money that he was entitled to under his Articles, but asserted no claim for salvage services.

He said that on the return voyage he stood regular radio watches in all respects as when the ship was outbound.

The following appears in his cross examination:

"Q. Did you at any time prior to the payoff consider that you were a salvor? A. I cannot say whether I did or I did not.

"Q. Who first gave you the idea? A. No one gave me the idea. On the homeward bound voyage there was * * * some conversation throughout the ship about well, maybe there is a salvage claim on this. Where the conversation originated or started I don't know—it was just scuttle butt drifting around the ship."

Later he said that Lishman, whom he met in the company's office, showed him a slip of paper which he signed because the others had, but the exact nature of it he said did not appear.

He said on redirect examination that he was not ordered to return to his ship on the morning of December 3rd, and on recross examination:

"Q. You did that on your own? A. On my own.

"Q. You never raised any questions about it, except inside yourself? A. I never asked myself did I have to go back. I went back because I felt it was the right thing to do."

He said later that the element of orders never entered into it.

The testimony of the following witnesses appears in depositions:

*Lishman:*

He was in the life boat that carried 7 members of the gun crew, the Chief Engineer, the Chief Mate, the Ensign the Purser and the Captain.

Describing the conditions in the harbor and at the jetty when the boat arrived, and the care that was taken of the wounded men, he said:

"The British were very wonderful that night. They had a sort of first aid station right under the stones to bathe the wounds of fellows who couldn't get too far and we went on from there with a warning from the soldiers to watch for broken wires, and eventually arrived at the Naval House and there we sat around and *waited for orders.* (Emphasis supplied)

"By Mr. McConnell:

"Q. Before you continue along those lines, Mr. Lishman—

"Mr. Cluff: Note my objection to Counsel interrupting at the most interesting part."

The purpose of the interruption is fairly obvious.

The witness stated that he counted 23 ships in the harbor and proceeded to explain which were ammunition ships and which were tankers, and what happened to them during the air raid, and the number that were afire. His narrative is quite revealing as to the picture which must have presented itself to Dahlstrom when he gave the order to abandon his ship. He volunteered that he had heard that over a thousand men lost their lives in this raid, and later that the actual total was over three thousand. He said that, when the abandonment of the Abbott was accomplished, there was no expectation on the part of anybody of saving the ship or returning to her, which of course is an opinion as to the state of mind of all persons other than himself.

He told of the first call that Belobraydich made for men to return to the ship, the witness then being at the Fleet Club,[1] and that eventually they arrived at the Navy House, where they found the Chief Mate and the Chief Engineer and other members of the crew. He said:

"We looked at it and it still looked pretty bad but we thought, let's go back, to hell with it—you just get that way—and see what it's like so we eventually got aboard this L.C.I. 136 * * * and we got under way about half past seven."

This witness told of the events which followed his arrival in Augusta, his presence in the hospital for three days, and his return to the ship prior to her going back to Bari; also of the return trip to New York, and he mentioned the men who were missing upon leaving Oran.

---

[1] "I heard that some of them had gone back.

"We didn't know what to do and we talked it over and decided we had better stay there until we see what happened further.

"Eventually, the Purser came back. I remember him distinctly coming back and asking the boys if they would care—he had been asked by the Captain, I think it was— * * *

"He said, 'Boys, I have been sent up here by the Captain,' the Chief Mate or whoever it was, 'to ask you to come back to the ship. Things seem to be a little better out there now, or we hope, and we are going to see, after an inspection, if it is safe enough for us to go out there and board her again. Are there any volunteers?'

"I remember he went down asking everybody for volunteers quite definitely. Well, of course, not many of them would go. They were quite decided, especially some of the black gang (the engine room crew), they were decided to stay where they were put until everything cooled off."

He said that the idea of making a claim for salvage occurred to him prior to his arrival in New York, and he spoke to other men and wrote three letters on the subject; that he made no claim on the Master or the agents of the ship or the War Shipping Administration, but decided to discuss the subject with a lawyer, which resulted in the filing of this cause.

*Link:*

He tells of conditions on the ship as a result of the bombing and that he heard the Captain give the order to abandon, and of the trip to the jetty; also the going to what he called the Navy First Aid Station, and thence to the Fleet Club. While there a British page came, calling for the crew of the Lyman Abbott, and directed them to the First Aid Station, where they waited "and it was not until dawn that we were told to go to this L.C.I. I went to the L.C.I." He stated that during the evening an explosion was heard, as to which some one said: "There goes the Lyman Abbott." He said "There doesn't seem to be any one who expected to go back to that ship."

He described his own state of mind when he entered the life boat leaving the Abbott,[2] and his stay in the hospital at Syracuse for 33 days, and his return with Belobraydich and joining the ship at Taranto.

He also made no claim for salvage prior to the filing of the libel.

The foregoing summarizes so much of the testimony for the libelants as is relied upon to demonstrate that, when the Master gave the order to abandon ship, he conceived of it as a final act, and as though the last curtain had been rung down and the stark drama brought to a hurried close.

The expressions attributed to the Captain are three: First: "I am sorry for the poor fellows * * *." Second: "We are going to get a new ship." or something like that, and Third: "We have lost a whole ship."

Assuming that these statements were made and that they were near enough in point of time to the order to abandon, to indicate the full and complete intention with which it was given, they still do not exclude a purpose on the part of the Master to return to the ship if that should prove to be feasible. Clearly his crew were in dire peril, even though the air raid had come to an end; the other ships that were burning and exploding constituted a menace to the safety of his own men, and the fact that the Army Lieutenant had been killed, and some of his own men injured, pointed to the necessity for getting the others immediately out of danger, if that should be possible, and the evidence as a whole is completely consistent with that preoccupation.

It is doubtless true, as will be seen from his own testimony, that the Master felt that the Abbott was probably doomed; but it does not follow that he went so far in his mind as to exclude the possibility of her survival, and to harbor a determination to consider himself and his crew relieved of all further duty with respect to the ship.

It is not a cause for wonder that there was no written record made at the time; nor any clear and convincing statement made by the Master to any one, of his precise thoughts—as though in anticipation of litigation—when he decided that the immediate safety of the men entrusted to his care was the most imperative requirement of a moment which was highly charged with peril.

From the libelants' own testimony it will appear that neither their own impressions

---

[2] "Q. Did you have any intention or expectation personally, of returning to that ship thereafter? A. No * * * I considered myself a volunteer."

Being cross examined on that subject, he testified:

"Q. Did any one tell you you were a volunteer? A. There certainly seems to have been an option offered.

"Q. Who gave you the option? A. By the very fact that they didn't force us to go. They came and told us, you were to go back and if you didn't, you didn't and if you did, you did."

After saying that it was not definitely an order to return, he said:

"Q. Who gave you the idea that you went back as a volunteer? Where did you first hear that? A. By the very fact, I went to the Chief Mate and we were the first to go back and there were quite a few that didn't go back, and by just seeing that, I realized I was a volunteer."

nor the conditions as they describe them can be relied upon to demonstrate that the abandonment was sine spe recuperandi, to employ an expression found in the text of early writers and in cases which have treated of this general subject.

The libelants, however, had the right to rely upon the testimony of the respondent's witnesses in order to piece out their case. Accordingly, attention must be given to the depositions of the following:

*Dahlstrom, the Master:*

It is unnecessary to repeat what has already been shown from the testimony of other witnesses concerning the conditions which rendered the abandonment order necessary, but the Captain's understanding of them can perhaps be gathered from excerpts of his narrative. He mentioned the hazard which he recognized in the presence of other ships which were either burning or had exploded, and said:

"* * * but particularly there was one Italian ship near us drifting down on us and the men were evidently trapped on her * * * So I told my men the Italian ship was burning and of course I got my fires out and I had a dangerous cargo and I wanted to get my men off to save them, * * * and so I told them to launch the boats * * * so that everybody got in the boats all right.

"Q. There came a time, I take it, when you gave an order to abandon ship? A. No, I told them to launch the boats, yes, and leave the ship. * * * I also asked the mate * * * where the men were; and I asked him about the conditions fore and aft and he says 'The fires are out', and he says that the men were wounded and that he thought the ship was sinking by the stern, and I thought so myself.

"So I gave a general order to the men to launch the boats and get off the ship."

He went into the engine room before leaving and found that no water was coming in, and he looked around the ship and made sure there were no fires, and did not leave until he was sure that everybody was off. Then he got into the boat and went ashore with the men, including those who were wounded (although the body of the Army officer who had been killed was left on board). Being on shore, he learned that the Military Authorities wanted everybody off the docks: "so we got the men off as soon as we could and I was one of the last men that walked up the dock, from my ship anyway." He spoke of arriving at the Navy House after sending the wounded to hospitals, and he said:

"* * * there was such a confusion and mess, you know, of all the wounded from the different ships—as a matter of fact, it was impossible to take any particular track of any certain individuals.

"Q. At the time you came ashore, Captain, were the crews of other vessels also coming ashore? A. Yes, they were coming ashore by the droves, you might say, some were swimming ashore.

"Q. Now, Captain, what was your purpose in ordering the ship to be abandoned at around eight o'clock? A. My purpose of course, to abandon ship, was to save my men because of the ships exploding and burning and some of them drifting down on us and the dangerous cargo that we had. Why, I wanted to save the men in case this ship would catch afire and blow up.

"Q. You considered the ship to be in great danger and also the lives of your crew? A. Yes.

"Q. When you left the ship, did you have any intention of leaving her permanently regardless of what happened to her? A. No, I had intended to go back as soon as I could make sure that she wasn't going to sink.

"Q. Did you make any statement to any members of your crew at any time that you were permanently abandoning the ship? A. No, I never did.

"Q. Did you make any statement to them at any time that you were releasing them from their duties to the ship? A. No, I did not.

"Q. At the time you were on the dock or the jetty, there, after attending to your wounded, did you say in substance to your crew or to any of your crew, something like this: 'Well it was a good show while it lasted. Good-bye, boys', or any words to that effect? A. I don't recollect saying anything like that outright. I might have

said, 'I will see you later on.' or I might have said, 'It was a good show,' not referring—because I was quite friendly with my crew, I had a good crew, and I was quite friendly and I suppose everybody coming to me and everybody asking different questions and so on, I was quite friendly to everybody, so I might have said it. I really don't recollect it but I never made no statement that would be construed that we were leaving the ship definitely because I didn't know if the ship was going to be sunk or not. I did pass a remark to some officer, I believe it was the steward, that as soon as the fire abates, I am going back to the ship. I told the mate, of course, I gave him orders to take care of the men ashore later on when I did get back to the ship and got in contact with everybody and gave—and got them back to the ship, that was what I did."

The Captain's deposition was taken on April 25, 1944, about five months after the occurrence, and the circumstances must be deemed to have been fairly clear in his mind.

He had no interest in the outcome of the cause, and his testimony is the more convincing for that reason.

It appears from the same deposition that he made a trip to the ship at about 2:00 A. M. and in that connection he asked if any of the men would come back with him, and four of them did, namely, the First Assistant Engineer, the Second Assistant Engineer, the Steward, and Lowrie, an A.B. Since all but one were officers, it can scarcely be wondered at that he made a request of them instead of issuing an order. The prevailing conditions clearly explain why the suggestion was couched in other than peremptory language. When he reached the ship and found a British officer on board, he asked the latter to relay instructions to the men still ashore, to return to the ship, thus:

"I told—he asked me 'Where is your gang?' so I told him that—there were four men with him, I told him 'Some are at the Fleet Club and some are at the hospital. Even if they are not injured badly they are up at the hospital.' So I told him to send them along in the morning and he told me he would."

It appears that the log entries were made on the following day and his cross examination concerning them appears in the margin.[3]

*Ledoux, First Assistant Engineer:*

Nothing in this witness' testimony tends to contradict that of Dahlstrom, nor to add any affirmative element to the libelants' cause.

*Maury, Second Assistant Engineer:*

The same remark applies to his testimony as to that of Ledoux. He originally intended to join in this cause, and said in that connection:

"I arrived in New York and I read the libel and it seemed a little bit far fetched to me and then I withdrew it."

Later on in his testimony, he pointed out allegations in the pleading which he criticised, and on cross examination in connection with a specific reference in the libel to the abandonment, which was read to him, he was asked:

"Q. * * * Now, is that the way you felt regardless of what happened to her? A. At the time you don't think much about that. If the ship were still there, she was still my ship."

*Grotevant, Chief Mate:*

He described the conditions which accompanied the order under which the men

---

[3] "Q. The next entry, 'Because of injured crew members and danger of fire from burning ships loaded with ammunition and gasoline drifting down on us and our being unable to fight fires because of all hoses broken, we were helpless.' Will you explain more in detail what that means, Captain? A. Well, the ships in my vicinity were exploding one after another, endangered my ship and the dangerous cargo and the men in my ship already were injured and some of them dying, for the safety of my men, I think —I give orders to leave the ship.

" *      *      *      *      *

"Q. When you say 'We were helpless', what do you mean by that? A. I was saying that I mean that it was no use to stay aboard the ship in such a condition and endanger all the people aboard the ship. So I thought it the best to do to get my men off for the time being and await further notice of what would happen."

left the ship, and the arrival at the jetty and the conditions there existing. He said:

"The Captain had told me to get the men together as near as·possible with the idea of going back, and I was making an effort to do it but everybody was running around here and there * * *."

He continued to explain conditions in the Fleet Club, and said that he there met various members of the crew and they gathered together in the gymnasium; some sort of order was observed at that place.

With respect to his efforts to procure the return of the crew pursuant to word received indirectly from the Master, he said:

" * * * and as I came upon members of our crew I would say the skipper is back on the ship and we are supposed to go on, and the idea is to get her out of here, meaning out of Bari, and I remember in one room I had an argument with one fellow, this one spokesman whose name was Reilly, he refused to go, and of course I didn't give him any order to go and I said 'it is up to you. It seems to me it is part of your job', and I said 'that is the reason I am going and you can do just as you please about it.' * * * I started away thinking they were not coming but they eventually joined the tail end of the crowd and I noticed them there. Reilly didn't come. I found out later he had developed burns and was hospitalized and he (was) badly burned, and maybe he had a good excuse for not coming."

Reverting to the landing:

"Q. And did you yourself have any expectation of returning to her? A. My orders were to wait, he told me first to keep the men together or keep as close to them as possible with the idea if things got so that we could, we would go back on her. My personal feeling was that it would not be there, but I was prepared to go back on and I had the idea, but I cannot swear what the other men thought. They all thought they would go back."

A study of the testimony as a whole establishes that the libelants have not sustained their burden of proof that there was a definite and final abandonment of the ship which released the libelants from their duties as members of the crew. The following cases have been consulted and are believed to expound controlling principles in such matters: The Superior, D.C., 270 F. 283; The C. P. Minch, 2 Cir., 73 F. 859; Clarke v. The Dodge Healy, 5 Fed.Cas., page 949, No. 2,849; Drevas v. United States, D.C., 58 F.Supp. 1008; Elrod v. Luckenbach S. S. Co. (The Susan V. Luckenbach), 62 F.Supp. 935, 1945 A.M.C. 1100; and The Victoria, D.C., 64 F.Supp. 370, 1945 A.M.C. 1199.

They contain helpful discussions as to what should be deemed to constitute abandonment as a final and conclusive act in the handling of a ship in the stress of peril.

The libelants cite: Mason v. The Blaireau, 6 U.S. 240, 2 Cranch 240, 2 L.Ed. 266; The Umattilla, D.C., 29 F. 252; The Georgiana, 1 Cir., 245 F. 321; The Lowther Castle, D.C., 195 F. 604; Dumper Scow No. 11, D.C., 48 F. 740; Elphicke v. White Line Towing Co., 8 Cir., 106 F. 945; Lincoln Steamship Line v. United States, 2 Cir., 7 F.2d 886; Hobson et al. v. Lord, 92 U.S. 397, 23 L.Ed. 613 (not a salvage case); and The Pleasure Bay, D.C., 226 F. 55. They have been examined, but are factually remote and do not require discussion, since none points to a decree in libelants' favor in view of the instant circumstances.

It is to be remembered that the vessel was not abandoned upon the high seas, but in a harbor, which, but for the enemy air raid, would have been a safe haven from perils of the deep, and she lay at anchor.

It is also true that these libelants signed on for hazardous service on a merchant ship, in time of war, and by the terms of their contract undertook all duties that might arise according to the probably hazardous occasions of the voyage.

The arguments for the libelants have received careful attention and one or two may be mentioned by way of assurance that they have not been overlooked.

Attention is called to the fact that no one heard the Master say that he intended to return to the ship. The confusion ran so high when arrival was had at the jetty and thereafter, that the Master could not have been expected to announce in measured

tones exactly what he hoped to accomplish in the future; absence of assertion of that kind is at best a negative suggestion concerning his actual purposes.

It is argued that the evidence revealed a complete absence of any attempt to keep the men together or arrange for their reassembly. Having in mind the conditions ashore, it seems that the Master and the Chief Mate did all that could reasonably be expected of them to keep in touch with the crew, as is demonstrated by the fact that 26 of them rejoined the ship. The presence of sailors, soldiers and members of the crews of other ships who had been forced to leave their vessels, is abundantly shown. If the Abbott had been the only vessel whose crew were put ashore, and there were no other complicating circumstances there encountered, it would be reasonable to expect that some measure of discipline would have been adopted to keep the men together and make it clear that they were still under orders, but that was an impossibility unless the testimony has been entirely misconceived by this court.

The conduct of the Master in visiting the pier or jetty once during the evening and again about 2:00 in the morning, to ascertain whether his vessel had been destroyed, was entirely consistent with a recognition of continuing duty on his part, which was incompatible with the state of mind attributed to him by the libelants. It is argued for them that the Captain's return indicated a change of his mind but I am unable to view it in that light. It seems rather to have been part of a consistent plan which had its origin when the order to abandon was given.

Nor is the libelants' cause strengthened by the contention that the men were asked to volunteer rather than ordered to return. As to the first group who accompanied Dahlstrom at 2:00 A.M., it must be clear that he was constrained not to put any one under the necessity for refusing to obey and to follow him into a position of obvious peril, and therefore he made the request which four of those under him honored. The same conditions to a lesser degree explain the attitude of Grotevant. He was trying to re-assemble the crew in the Fleet House; he was more concerned with getting together all the men who were physically able to respond than in observing any niceties of diction in suggesting their exact status to them.

It is argued that, having returned to the ship, the discipline of the outbound voyage was not maintained, from which perhaps it is intended to suggest that all of the crew were recognized by the Master as being a group of volunteers who decided for themselves how the ship would be navigated, what duties they would perform, and whether they would function at all. In other words, that the homewardbound voyage was conducted along the lines of a debating society, and therefore the men knew that they were salvors and so did the Master.

I find nothing in the record to justify that argument, nor anything in the testimony of the four libelants which would tend to sustain any such position.

The record as a whole is consistent with a genuine desire to bring the ship safely to the United States after the harrowing experiences of December 2nd, and after she should have discharged her cargo following the interruption caused by the air raid. The testimony of the men has not been examined in any unfriendly spirit, because it is realized that they suffered a harrowing experience and much hardship, and that in putting forth their claims for salvage they have not revealed anything more than a desire to obtain this special form of reward if it should appear that they are legally entitled thereto.

The testimony of Dahlstrom and Grotevant is persuasive that this was a good crew, and it will be understood that the decision of the cause is based entirely upon the evidence as it is presently understood, and the applicable authorities.

For these reasons, it is concluded that the libel must be dismissed but without costs.

Findings have been made and are filed herewith.

Settle decree.

### Findings

1. The S.S. Lyman Abbott is a Liberty ship built during 1942, owned, operated and controlled by the respondent United

States of America at all times presently material, of 7900 tons gross, 5000 tons net register. She is 440' long, 70' in beam, and is steam propelled, single screw, and her speed is about 11 knots.

2. For present purposes only, her value in damaged condition was not more than $1,200,000.00 and not less than $600,000.00, and the approximate value of her cargo of war materials exclusively, on December 2 and 3, 1943, was $3,000,000.00.

· 3. She sailed from Baltimore, Maryland, on November 2, 1943, with a merchant crew of 42 and a Naval armed guard crew of 28 and an Army Security Officer.

4. The cargo laden on the Abbott was for use in the Armed Forces in Europe, and consisted of ammunition, high explosives, high test gasoline, and other military gear and equipment.

5. All members of the crew signed shipping Articles which provided that the vessel was bound from the Port of Baltimore, Maryland, to "a point in the Atlantic Ocean to the eastward of Baltimore, Md., and thence to such ports and places in any part of the world as the Master may direct or as may be ordered or directed by the United States Government or any department, Commission or agency thereof, and back to a final port of discharge in the United States, for a term of time not exceeding 12 calendar months."

6. The said Articles contained the following:

"It is agreed that the Master, Officers and members of the crew shall be furnished the War Risk Insurance Protection covering loss of life, disability (including dismemberment and loss of function), detention (including repatriation and similar cases), and loss of or damage to personal effects prescribed by the decisions of the Maritime War Emergency Board, as amended or modified from time to time, and the Marine Risk Insurance Protection covering such items afforded by the Second Seamen's War Risk Policy, as amended. Such personnel shall also receive the War bonuses specified by the decisions of the Maritime War Emergency Board, as amended or modified from time to time."

7. The Abbott arrived as a part of a convoy of 8 in the Harbor of Bari, Italy, on December 1, 1943, and anchored somewhere near the center of the harbor, awaiting an opportunity to discharge her cargo at a wharf or pier in due course, which could not be promptly accomplished by reason of the presence there of other vessels.

8. At about 7:00 P.M. on December 2, 1943 (the vessel being still at anchor), an air raid by enemy planes took place, the devastating effect of which upon other vessels in the harbor, some of which were struck by bombs and one or more of which burst into flames, and another of which (thought to be carrying ammunition) exploded, brought about a condition of dire peril to all the vessels in the harbor.

9. The Abbott was struck by flying debris, pieces of metal, and a section of steel deck plating weighing about 6 tons; her fire hose lines were broken, her cargo booms, tackle, cable, hatches and other gear were smashed, and one of those on board the vessel was killed; the Second Mate was severely wounded and subsequently died, and others on board suffered bodily injury; an Italian ship which was afire appeared to be drifting toward the Abbott. Fire broke out on deck, which could not be quenched by the use of fire hoses, but which did yield to smothering by the use of a hatch cover. The vessel heeled to port under impact of the blow inflicted by the 6-ton piece of deck steel, and the Master and one or more of the officers thought that she was in danger of sinking.

10. At about 7:45 P.M. and after the air raid was over, the Master ordered the wounded to be taken off in such of the ship's boats and life rafts as were available, and that the crew abandon the ship. Notwithstanding the cessation of the air raid, the position of the ship was one of great peril at that moment by reason of the explosions which were still occurring on other ships in the harbor, and the fact that some of them were afire and therefore likely to continue to menace the safety of all on board the Abbott because most of the said ships were known to carry cargo similar to that laden on the Abbott.

11. When the order to abandon ship became known to the ship's company, the engine room plant was secured by shutting off the dynamos, shutting down the fires, and cutting out the boilers; as soon as conditions permitted, all persons on board, except the one who had been killed, took to the two remaining life boats and the life rafts, and made their way to a pier or jetty through the perilous waters of the harbor, upon the surface of which there were oil slicks some of which were blazing; a careful course had to be maintained to avoid other vessels which had been damaged in the air raid, and which were potential sources of danger to the men thus making their way to shore.

12. On arrival at the jetty, the officers and crew of the Abbott discovered that there were there present a great many seamen from other vessels who had similarly sought to escape the dangers of the harbor, many of whom were wounded and needed prompt attention. Some semblance of order was being maintained by British troops there stationed, and as soon as possible wounded men from this and other ships were dispatched to hospitals, and those who did not require such treatment were directed to proceed in groups to the Navy House where they received dry clothing, hot tea and such attention as could be given them; thence they proceeded to the Fleet Club distant about a mile and a half, where efforts were made to care for them in such shelter as the Club provided. Men of many nationalities were included in those who thus came ashore from the various ships in the harbor.

13. It was impossible for the Master or officers of the Abbott to maintain any form of organization among the members of her crew, by reason of the confusion which existed on the jetty, at the Navy House, and later at the Fleet Club, but the men from the Abbott who did not require hospitalization more or less kept together, and the Captain and the Mate from time to time spoke to them and maintained contact with them.

14. During the evening Dahlstrom, the Master, proceeded from the Fleet Club back to the docks to ascertain whether the Abbott was still afloat, and he observed that she was, in spite of explosions which had occurred all during the interval, proceeding from the harbor.

15. At 11:00 P.M. the Master returned to the Fleet Club and heard the report that his vessel had been sunk, and he again returned to the jetty and ascertained that the report was untrue; he went back to the Fleet Club and, by interviewing one or more of the officers and men, urged that some of them return with him to the ship, and he succeeded in inducing Ledoux, the First Assistant Engineer, Maury, the Second Assistant Engineer, White, the Steward, and Lowrie, an A.B., to accompany him on that mission, which he accomplished at about 2:00 A.M. on December 3rd.

16. Arriving at the ship, the Master found a British Navy Commander on board, and observed that conditions on the Abbott were more favorable than he had feared they would be, and he requested the said British Navy Commander to send a message to the Chief Mate and the crew, then at the Fleet Club, to return to the ship.

17. The Master and his party were able to create some condition of physical order on the Abbott, although he discovered that one or more hatch covers had been blown off, there were holes in the decks, and there was a small fire in the mooring line, which was promptly extinguished; soundings were taken, and it was found that the vessel was not making water.

18. The message referred to in Finding 16 was ultimately communicated to Grotevant, the Chief Mate, who, being in the Fleet Club, rounded up all remaining members of the crew who were there, 22 in number, and requested them to return with him to the ship.

19. All of the libelants and the members of the crew who had not been hospitalized finally accompanied Grotevant back to the

Abbott on board a Jugo-Slav L.C.I. at about 7:00 A.M. on December 3rd, and thereupon the Master instructed Grotevant to proceed with disposing of the litter on the decks of the vessel, and otherwise put her in condition for possible discharge of her cargo, and then the Master went ashore to report to the Military Authorities in charge of Bari and to ascertain the condition of the members of the crew who had been hospitalized.

20. The said instructions were carried out by the Mate and the members of the crew who were then on the Abbott, and the vessel under the command of the Mate, at about noontime, raised anchor and proceeded out of the harbor in obedience to military instructions.

21. The Master rejoined the ship outside the harbor at about 3:00 P.M. on December 3rd, and thereafter the Abbott proceeded in convoy to Augusta, Sicily. The voyage was a difficult one, the ship being short handed and steering with great difficulty because the rudder was partially jammed in a port position, and many members of the crew were suffering mustard gas burns, and were otherwise physically handicapped in performing their arduous tasks.

22. Arrival at Augusta was had on December 5th, and all injured men were given medical attention, 14 being hospitalized for burns, and the ship remained in Augusta until December 22, 1943, whence she returned to Bari on December 24th and there discharged her cargo.

23. On January 10, 1944, departure was had from Bari for the United States via intermediate ports, and the homeward voyage was concluded at New York on March 10, 1944.

24. No new Articles were signed after the original ones referred to in Findings 5 and 6, by any of the members of the crew after December 2, 1943, and until the crew were paid off in New York on March 16th.

25. On March 16, 1944, the libelants were paid off before the Shipping Commissioner, receiving in addition to their base compensation a War bonus of $100 a month, an area bonus of $5 a day, a port attack bonus of $125, and an explosion bonus of 15% of base wages, as well as payments for loss of personal effects, and disability payments, as shown below:

| Name | Gross wages for round voyage | Net wages after deduction of advances & allotments | Payments for loss of personal effects | Payments for disabilities |
|---|---|---|---|---|
| Belobraydich, 3rd cook Steward | $1805.55 | $1321.62 | $131.35 | $430.00 |
| Lishman, Utility Messman | 1573.49 | 1424.72 | 142.50 | — |
| Link, O.S. | 1126.46 | 442.74 | 112.94 | 300.00 |
| Salkay, Radio Operator | 2262.30 | 1055.66 | 35.00 | — |
| Binning, Jr. Asst. Purser | 1720.00 | 635.55 | 80.00 | 500.00 |
| Tischauer, Messman | 1545.01 | 829.70 | 74.35 | — |
| Hurst, Messman | 928.50 | 620.38 | 68.45 | — |
| Hodak, A.B. | 1731.23 | 1095.38 | — | — |
| Leesnitzer, Deck Engineer | 1247.68 | 929.27 | 207.75 | 676.67 |

 

26. No libelant made a claim for salvage prior to or at the time that he rejoined the ship on December 3, 1943.

27. No libelant made any claim for salvage after rejoining the ship on December 3, 1943, during the homeward voyage.

28. No libelant made any claim for salvage at the time that all members of the crew were paid off on March 16, 1944, nor at any time prior to the filing of the libel herein on March 27, 1944.

29. The libelants in this cause, 9 in number, constituted one-third of the 27 men who rejoined the ship at Bari on December 3, 1943.

30. Of the 9 libelants, 4 testified in this cause.

31. When the Master, Dahlstrom, gave the order to abandon ship on December 2, 1943, he did so in order that the wounded might be taken ashore and the others of the ship's company be promptly removed from a position of great peril caused by conditions in the harbor which have been stated, to one of comparative safety ashore, and not with the intention of failing to repossess himself of the the ship if circumstances should render that possible.

32. The expressed belief of the Master that the ship was sinking was based upon a hasty and incomplete inspection, and was not incompatible with an intention on his part to return in the event that his belief should prove to be unfounded.

33. The decision of the Master to withdraw the crew and himself from the ship was induced by the presence of a burning ship and one which had exploded, neither of which was nearer than 900 feet from the Abbott, and by the presence of flying particles of steel metal and shrapnel with which the air was filled, and which might cause the cargo of the Abbott to explode and thus bring about great loss of life on the part of the crew.

34. The order to abandon ship and the withdrawal of the crew from the Abbott, under the circumstances of this cause, was not a final abandonment of the ship without purpose to return if that should prove to be feasible, and did not discharge the libelants and other members of the crew from the obligations created by the ship's Articles.

## Conclusion of Law

The libel must be dismissed but without costs.